Alice BURGER–FISCHER, Michal Schonberger, Goldie Hoffmanengel, and Hester Haszkel, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

DEGUSSA AG and Degussa Corporation, Defendants.

Michael Vogel, Maria Dorenblat, Vernon Rusheen, and Maria Richman, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Degussa Ag and Degussa Corporation, Defendants.

Malka Lichtman, individually and on behalf of all others similarly situated, Plaintiff,

v.

Siemens Ag, Defendant.

Martha Klein and Zelig Preis on their own behalf, and on the behalf of all other persons similarly situated; namely persons and the heirs of persons compelled to perform slave labor for Siemens AG between 1939 and 1945, Plaintiffs,

v.

Siemens Ag, Defendant.

Civil Action Nos. 98–3958(DRD), 98–5019(DRD), 98–4252(DRD), 98–4468(DRD).

United States District Court, D. New Jersey.

Sept. 13, 1999.

As Amended September 21, 1999.

Anderson, Kill & Olick, P.C., Steven J. Pudell, Newark, NJ, Robert A. Swift, Martin J. D'Urso, Kohn, Swift & Graf, P.C., Philadelphia, PA, Lawrence Kill, Linda Gerstel, Anderson, Kill & Olick, P.C., New York City, Edward D. Fagan, Karen D'Avino, Fagan & D'Avino, LLP, Livingston,

NJ, William Marks, The Marks Law Firm, P.C., Washington, DC, Jon M. Van Dyke, Honolulu, HI, Michael Witti, Munich (Bogenhausen), Germany, for Burger–Fisher, plaintiffs.

Goldstein, Lite & DePalma, LLC, Allyn Z. Lite, Joseph J. DePalma, Newark, NJ, Burt Neuborne, New York City, Elizabeth J. Cabraser, Morris A. Ratner, Lisa J. Leebove, Karen J. Mandel, Lieff, Cabraser, Heimann, Bernstein, LLP, New York City, Melvyn Weiss, Deborah Sturman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Joseph D. Ament, Michael B. Hyman, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL, Irwin Levin, Richard Shevitz, Cohen & Malad, P.C., Indianapolis, IN, Michael D. Hausfeld, Paul T. Gallagher, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Martin Mendelsohn, Washington, DC, for Vogel plaintiffs.

Cohn, Lifland, Pearlman, Herrmann & Knopf, L.L.P., Peter S. Pearlman, Saddle Brook, NJ, Stephen A. Whinston, Edward W. Millstein, Berger & Montague, P.C., Philadelphia, PA, Mel Urbach, Law Offices of Mel Urbach, Jersey City, NJ, J. Dennis Faucher, Patrick Cafferty, Michael Dell'Angelo, Miller, Faucher, Cafferty & Wexler, L.L.P., Philadelphia, PA, William J. Cook, Ness, Motley, Loadholt, Richardson & Poole, Barnwell, SC, for Lichtman plaintiffs.

Goldstein, Lite & DePalma, L.L.C., Allyn Z. Lyte, Joseph J. DePalma, Newark, NJ, Burt Neuborne, New York City, Elizabeth J. Cabraser, Morris A. Ratner, Karen J. Mandel, Lieff, Cabraser, Heimann & Bernstein, L.L.P., New York City, Joseph D. Ament, Michael B. Hyman, Much, Shel-

ist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL, Barry A. Fisher, Fleischman, Fisher & Moest, Los Angeles, CA, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Melvyn I Weiss, Deborah M. Sturman, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, Irwin Levine, Richard Shevitz, Cohen & Malad, P.C., Indianapolis, IN, Michael D. Hausfeld, Paul T. Gallagher, Angieszka Frysman, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Martin Mendelsohn, Washington, DC, Arthur Miller, Cambridge, MA, for Klein plaintiffs.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione, John J. Gibbons, Kevin J. McKenna, Newark, NJ, Thomas R. Valen, Brian R. Howe, Jennifer A. Hradil on the Memorandum, for defendant Degussa AG.

Shanley & Fisher, PC, Thomas F. Campion, Jr., Morristown, NJ, for defendant Degussa Corp.

Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., James C. Orr, Keith G. Von Glahn, Newark, NJ, Kirkland & Ellis, Thomas D. Yannucci, Christopher Landau, James F. Basile, Daryl Joseffer, Brant W. Bishop, Washington, DC, for defendant Siemens AG.

Peter Heidenberger, Thomas G. Corcoran, Jr., Berliner, Corcoran & Rowe, Washington, DC, for amicus curiae The Federal Republic of Germany.

Bronislaw Geremeck, Minister of Foreign Affairs, Republic of Poland, PL, Warsaw, for amicus curiae The Republic of Poland.

DEBEVOISE, Senior District Judge.

## TABLE OF CONTENTS

I Parties and Proceedings ................................................. 250
 A. The Degussa Cases .............................................. 250
 B. The Siemens Cases .............................................. 253
 C. Defendants' Motions ............................................ 254

II Plaintiffs' Rationale .................................................... 255

III Context of the Post-war Treaties ........................................... 262

IV Agreements Concerning Reparations ....................................... 265
 A. Potsdam Agreement .................................................. 265
 B. Paris Agreement ..................................................... 265
 C. Bilateral Peace Treaties ............................................. 266
 D. The Transition Agreement ........................................... 267
 E. The London Debt Agreement ......................................... 268
 F. Soviet and Polish Waivers ........................................... 269
 G. Implementation of the Transition Agreement .......................... 269
 H. The 2 + 4 Treaty ................................................... 272

V Justiciability of Plaintiffs' Claims ......................................... 272
 A. Existence of Claims ................................................. 272
 B. Status of Private Claims in Reparation Context ........................ 273
 C. Effect of Post War Treaties .......................................... 276
 D. The German Cases ................................................... 279
 E. Conclusion ......................................................... 281

Plaintiffs in these four class actions have brought these proceedings against two German corporations, Degussa AG[1] and Siemens AG. Degussa is charged with having refined the gold seized from inmates of the Nazi concentration camps with knowledge of its source, with use of slave labor and with having manufactured Zyklon B used in the notorious gas chambers of Auschwitz and other concentration camps. Siemens is charged with having made extensive use of slave laborers furnished to it by the Nazi regime during World War II.

Relying on customary international law and the laws of Germany, plaintiffs seek, in the case of Degussa damages or restitution for the gold and other precious metals taken from the victims which Degussa refined for the Nazi Regime and damages on account of the Zyklon B which it provided for use in the gas chambers and, in the case of Siemens and Degussa, compensation for the enforced labor and damages for the oppressive conditions in which they were compelled to live and work.

Jurisdiction is asserted under (i) 28 U.S.C. § 1331 on the ground that plaintiffs, United States citizens, assert claims for violation of international treaties, fundamental human rights laws and customary international law, enforceable in this court under federal common law, (ii) 28 U.S.C. § 1332(a) on the ground that there is diversity of citizenship of the parties and the amount in controversy exceeds $75,000 and (iii) 28 U.S.C. § 3167 on the basis of general principles of supplemental jurisdiction.

Defendants moved to dismiss on multiple grounds. Consideration of the questions of in personam jurisdiction and forum non conveniens was deferred, and the parties were requested in the first instance to address the various questions going to justiciability and the question whether plaintiffs' claims are barred by the statute of limitations.

## I. Parties and Proceedings

**A. *The Degussa Cases:*** The two cases against Degussa allege substantially the same facts and will be treated in this opinion as if they were a single case. Initially it is necessary to summarize the circumstances of each plaintiff. Reliance will be had upon the allegations of the respective complaints. Each plaintiff is now a United States citizen living in this country.

---

**1.** In addition to the German corporation, Degussa AG, plaintiffs in Civil Action 98–3958 and Civil Action 98–5019 have named as a defendant Degussa AG's wholly owned United States subsidiary Degussa Corporation. Reference to "Degussa" in this opinion will be to the German Degussa AG.

Alice Burger–Fischer was born in 1938 in Czechoslovakia. The Nazis arrested her and her family sending them first to a ghetto and then to the concentration camp at Auschwitz in Poland. At Auschwitz the camp authorities took all of Burger–Fischer's parents' and grandmother's possessions including gold and precious metal jewelry. Burger–Fischer's grandmother's younger brother and mother were killed in the Auschwitz gas chambers and her father and younger brother, sent to the Mauthausen concentration camp, died on a death march in March, 1945. Burger–Fischer was sent to the concentration camp at Bergen Belsen where she was stripped of her possessions including her coat with gold and precious metal jewelry sewn into it. She believes that Degussa, knowing the source of the family's gold and precious metal jewelry, melted it and refined it into marketable purity.

Michal Schonberger was born in 1930 in Czechoslovakia. He and his family were deported to various concentration camps, including Auschwitz, Berkenau and Buchenwald where, upon arrival, they were stripped of their gold eyeglasses, gold jewelry and dental gold. He witnessed SS troops pull gold teeth from the mouths of live and dead concentration camp inmates. He believes that Degussa refined the looted gold knowing its source.

Goldie Hoffman–Engel was born in Czechoslovakia in 1923. She and her family were arrested and sent to Auschwitz/Berkenau where they were stripped of their possessions, including gold and precious metal jewelry. Hoffman–Engel was forced to work in the crematoria and observed camp officials pulling dental gold from the bodies of the victims. Her entire family except herself and her brother Isaac were killed in the death camp. She believes that Degussa, knowing its source, refined the gold taken from her parents' teeth and the other seized gold and jewelry.

Hester Haszkel was born in Cluj, Romania in 1931. When the Nazis raided her town in 1944 she, her parents and her five siblings were sent to Auschwitz. The were forced to remove and leave their gold jewelry behind. At Auschwitz Haszkel's entire family was killed. Haszkel had observed the camp personnel searching for and removing gold dental fixtures from the victims' lifeless bodies. She believes that the gold dental fixtures taken from her parents' bodies were sent to Degussa to be melted and refined.

Michael Vogel was born in Czechoslovakia. In September 1942, the Nazis deported him, his parents, two brothers and two sisters to Auschwitz. His mother and two of his siblings were killed immediately in the gas chambers with Zyklon B. Another brother and sister and his father were forced to perform slave labor and subsequently were killed in the gas chambers. Vogel was stripped of his valuables, including a gold watch upon his arrival at Auschwitz. From 1942 through the fall of 1944 Vogel was forced to work as part of an "Aufraeumungs–Kommando". As such he was required to search for gold, jewelry, watches and other valuables in the personal belongings taken from deportees upon their arrival at Auschwitz prior to their selection for death or slave labor. He was forced to sort the valuables into different categories and believed they were sent to Degussa for melting and refining.

Maria Dorenblat was born in Poland in 1910. Upon her arrival at Auschwitz, camp personnel stripped her of a diamond and gold watch and jewelry. They pried the gold overlays from her mouth. The man she later married, Michael Dorenblat, arrived separately with his first wife and a child. Camp personnel killed the first wife and child and seized Mr. Dorenblat's gold watch, gold cufflinks and wedding band and ripped the gold fillings from his mouth. It is alleged that the various gold items were shipped to Degussa for processing.

Vernon Rusheen was born in Berlin, Germany in 1924. In 1938 the Nazis re-

quired that Jews surrender their valuables and precious metals to the government, which Rusheen's parents proceeded to do. The family clothing business was "Aryanized", and in February, 1943 the entire family was rounded up, sent to a collection point in Berlin and shipped to Auschwitz. There the family was stripped of its remaining valuables, which Rusheen believes were sent to Degussa for processing. Rusheen's parents were sent to the gas chambers and killed by Degussa's Zyklon B. Rusheen himself was forced to perform slave labor at Auschwitz. When he became ill he was sent on a death march from Auschwitz to Dachau on January 14, 1945, along with 6,000 other prisoners, of whom only 300 survived the march. Rusheen performed slave labor at Dachau until liberated in May 1945.

Maria Richman was born in Poland in 1922. In 1942, after the 1939 fall of Poland, the Nazi government sent 20 year old Richman, her parents, four grandparents, her great-grandmother, five siblings and more than 170 other family members to Auschwitz. All but Richman and four other members of her family were killed in the gas chambers of Auschwitz through the use of Zyklon B. Upon their arrival at Auschwitz the gold jewelry and other valuables belonging to the members of the family were seized and, Richman believes, were sent to Degussa for processing. Richman herself was forced to perform heavy labor at Auschwitz from 1942 through 1945, sorting through the belongings of the camp's victims and filling trunks with gold, silver and jewelry which she believes were sent to Degussa for melting.

The complaints against Degussa allege that from 1933 to 1945 Degussa, then and now a major German corporation, actively cooperated with the Nazi regime. Part of this cooperation consisted of receiving from the concentration camps, ghettos and other collection points gold taken from the jewelry, precious metal, coins, eyeglasses and teeth of those being persecuted. De-

gussa was fully aware of the sources of the gold and nevertheless solicited the business of processing and refining it, an important source of government gold needed to finance prosecution of the war. The complaints further allege that Degussa utilized slave laborers in various of its manufacturing and refining facilities and that it was a principal source of Zyklon B, the agent used in the gas chambers to kill the victims.

The plaintiffs in the Burger–Fischer case seek to represent a class consisting of "all Holocaust victims, their heirs and beneficiaries who, between 1933 and 1945, had their personal assets, including but not limited to gold taken from jewelry, precious metal coins, eyeglasses and teeth, stolen from them as concentration camp inmates and/or other persecutees of the Nazi regime and its allies."

The plaintiffs in the Vogel case seek to represent a class consisting of "all Holocaust victims and survivors, their heirs and beneficiaries, who were injured as a result of Degussa's independent conduct in, and participation in the Nazi regime's systematic practices of (i) looting personal property, including but not limited to gold, jewelry, eyeglasses, watches and dental gold; (ii) using and profiting from slave and/or forced labor; and (iii) manufacturing, marketing, and profiting from the sale to the Nazi regime of Zyklon B, a key component of the Nazi regime's program of genocide."

The theories of recovery advanced in the Degussa complaints (asserted under international and German law) are civil assault and battery, conversion, unjust enrichment, accounting, violation of human rights and customary international law as evidenced by numerous treaties, conventions, declarations and the like and, conspiracy with the Nazi regime, individual Nazis and other German corporations.

The relief sought in each of the Degussa cases is (i) an accounting; (ii) a constructive trust; (iii) restitution of rightfully

owned property and the value of slave and/or forced labor; (iv) disgorgement of illicit profits obtained by transacting in looted property and employing slave and/or enforced labor; (v) compensatory damages with interest compounded annually from May 8, 1945, to the present arising out of, among other things, defendant's liability for transactions in looted property, profits from slave and/or forced labor, and aiding and abetting the murder of millions of deceased family members; (vi) a single award of exemplary or punitive damages, (vii) attorneys fees and (viii) costs of the action.

**B. _The Siemens Cases:_** The two cases allege substantially the same facts and, like the Degussa cases, will be treated in this opinion as if they were a single case. The complaints set forth the experiences of each plaintiff as an enforced laborer for Siemens.

Martha Klein was born in 1922 in Hungary. In August 1944 German troops seized her, forced her to walk to Austria from where she was transported by train to the concentration camp at Ravensbrueck. There Siemens employees selected her to work at the Siemens factory in Ravensbrueck. With hundreds of others she was placed in a wooden barracks which lacked light, heat, insulation from rain, running water or sewage facilities. The inmates slept in three-tiered wooden bunks, four women to a bed. Food consisted of a bowl of watery potato-skin and grass soup each day and a slice of bread twice a week.

The inmates were awakened at 4:00 a.m., forced to stand at attention for hours at roll call and assigned heavy labor. At the barracks where Klein was interned with 2,500 other forced laborers there was one latrine and one washroom. She endured these conditions until December 1944 when the women were evacuated.

Zelig Preis was born in Poland in 1924. When the German army overran Poland in September, 1939 the country became a major source of slave labor. In 1942 Preis was seized by German troops and transported by cattle car to the Plaszow concentration camp. In July, 1942 Siemens employees selected Preis to work in its Bau–Union plant, an annex to the concentration camp. There he lived in conditions similar to those which Klein endured.

Slave laborers were awakened at 5:00 a.m. and required to run to a 6:00 a.m. assembly and roll call. From there they walked six miles to a Siemens construction site where they performed heavy labor for ten to twelve hours. Those who could not keep the pace were beaten, executed on the spot or sent to nearby Auschwitz to be put to death in the gas chambers.

Malka Lichtman was born in Czechoslovakia in 1920. In the spring of 1944 she along with many other Jews were evicted from their homes and sent to a ghetto. Seven weeks later she was transported to Auschwitz. After a month at Auschwitz she and about 250 other female prisoners were loaded into trucks which transported them to Nuremberg. There they were forced to work in a Siemens airplane parts factory, living and working in inhumane conditions. Many of Lichtman's fellow laborers died while under the control of Siemens.

The complaints allege that before and during World War II Siemens was a major German corporation manufacturing, among other things, electronics and communications equipment essential to the ability of the Third Reich to wage its war of conquest. The shortage of manpower in Germany became acute and in order to fill the needs of German industry there was developed a system of involuntary forced laborers. These slave laborers were drawn from the conquered nations, Russian prisoners of war and the concentration camps.

Organized by the Nazi government, the slave labor program enabled private industry to draw upon a huge pool of potential workers, who were not paid and who lived and worked in abominable conditions. Particularly appalling were the conditions

to which the Jewish workers were subjected.

It is alleged that Siemens requisitioned for employment in its many plants nearly 100,000 foreign workers, prisoners of war and concentration camp inmates; exploiting them ruthlessly, subjecting them to abuses and ill treatment and profiting greatly from this source of unpaid labor. The plaintiffs in these cases, each being a United States citizen, are typical of the many thousands who passed into Siemens control.

Plaintiff in the Lichtman case seeks to represent a class consisting of "all persons, or their heirs, who were taken from concentration camps or ghettos and forced into slave labor for Siemens", thus apparently limiting this case to Jewish slave laborers. Plaintiffs in the Klein case seek to represent a broader class consisting of "all persons and the heirs of all persons who were compelled to perform slave labor for Siemens between 1939 and 1945", thus including in addition to Jewish slave laborers prisoners of war and persons from occupied nations compelled to work in Siemens' plants.

The theories of recovery in the Siemens complaints are violations of customary international law and the laws of nations and, under the laws of Germany, false imprisonment, unjust enrichment and wrongfully causing death.

The relief sought in the Siemens cases is (i) an accounting to Siemens' slave laborers for any profits or economic benefits derived by Siemens or any of its wholly-owned American subsidiaries from the knowing, systematic use of slave labor; (ii) payment to the slave laborers and their heirs the reasonable value of their services to Siemens; (iii) compensatory and punitive damages for Siemens' knowing use of slave labor and imposing barbaric working and living conditions; (iv) impressing a constructive trust upon all assets owned or controlled by Siemens that are traceable to the systematic use of slave labor, together with reasonable interest thereon; (v) reasonable attorneys' fees and experts' fees; and (vi) costs of suit.

**C. Defendants' Motions:** Degussa moved to dismiss the complaints against it on a number of grounds; (i) the Court lacks personal jurisdiction over Degussa, A.G.; (ii) dismissal is required under the principle of forum non conveniens; (iii) the Court lacks subject matter jurisdiction to adjudicate plaintiffs' war-related claims because they are within the exclusive province of state-to-state resolution; (iv) the Court should abstain on grounds of international comity; (v) plaintiffs' claims are barred by any potentially applicable statute of limitations; and (vi) plaintiffs' claims founded on international law fail because plaintiffs lack a private right of action thereunder.

Siemens moved for dismissal on essentially the same grounds as Degussa, and, in addition asserted that Lichtman lacks standing to assert a wrongful death claim.

Determination of defendants' challenge to in personam jurisdiction and their contention that the cases should be dismissed pursuant to the doctrine of forum non conveniens was deferred, and the parties addressed in the first instance the multi-faceted issue of justiciability and the question whether plaintiffs' claims are barred by applicable statutes of limitations. In support of their respective positions the parties filed extensive appendixes containing, among other data, copies of the applicable war-time and post-war treaties and agreements, pertinent opinions of German courts addressing questions concerning reparations for slave labor and persons whose property was seized by the Nazi government, and certifications or affidavits of eminent scholars, historians and experts in international and German law. The parties briefed the issues both before and after oral argument on the motions. The critical issue, the resolution of which is dispositive of these cases, is whether in light of post World War II diplomatic history the plaintiff victims, and representa-

tives of victims of the Nazi regime can bring an action in this Court against private German corporations which participated in and profited from the atrocities committed against plaintiffs and those they seek to represent.

## II. Plaintiffs' Rationale

Plaintiffs' factual allegations as contained in the pleadings and supporting declarations must be accepted as true. They are totally consistent with the history of the Nazi era and with the record developed during the post-war trials in Nuremberg. In brief Degussa's and Siemens's executives were fully aware of the widespread use of slave labor and of the inhumane conditions in which the victims lived and worked. The two corporations were aware that this program was utilized not only to advance the German war effort, but also as part of the Nazi goal of exterminating the entire Jewish community in Germany, in the territories of its allies and in the conquered lands. Degussa was aware of the uses to which the Zyklon B it manufactured would be used in the concentration camps and was aware that the gold it refined was seized from the Jewish people at their places of residence, when they arrived at concentration camps and from their bodies before and after they had been killed. Knowing this Degussa and Siemens voluntarily participated and profited from the use of slave labor and in the case of Degussa, in the manufacture and sale of Zyklon B and the refining of the stolen gold.

As plaintiffs' factual allegations must be accepted, so also must be accepted their statement of substantive law. Defendants' actions violated customary international law, a law which "results from a general and consistent practice of states followed by them from a sense of legal obligation." Restatement (Third) of the Foreign Relations Law of the United States, § 102(2) (1987). Plaintiffs have cited numerous

treaties, court decisions and United Nations resolutions, not as a source of their substantive rights but rather as evidence of the content of customary international law. Plaintiffs cite the work of the Nuremberg tribunals as a further source of the content of customary international law particularly pertinent to the facts alleged in these cases. There can be little doubt that the acts in which the defendant corporations are alleged to have engaged were and are proscribed by customary international law.

Authoritative German scholars have provided declarations establishing that defendants' alleged conduct violated German civil law in effect at the time they engaged in that conduct.

It is plaintiffs' contention that their individual claims against private German corporations under German civil law and under customary international law never were and never were intended to be subsumed under the series of treaties and agreements concerning reparations which followed the end of World War II.[2] Moreover, plaintiffs contend, even if the nation states negotiating these treaties and agreements intended to subsume plaintiffs' claims they could not be given effect for the reason that under customary international law as it has developed a private law claim cannot be destroyed by a peace treaty unless the treaty provides an adequate alternative method of compensation.

Tracing the diplomatic history of the post-war period plaintiffs challenge the defense contention that their claims were subsumed or intended to be subsumed.

They note that the Potsdam Agreement and the Treaty of Paris of 1946 represented an attempt to dismantle Germany's industrial capabilities by physically transferring the major portion of Germany's industrial plant to the victors to be used to compensate the victims of Nazi

---

**2.** For the purposes of this discussion it is assumed that plaintiffs' claims are not barred by any applicable statute of limitations.

oppression. If implemented, that method of providing reparations would have superseded private claims against private corporations because the assets of the principal corporate wrongdoers would have been seized to compensate the victims.

Plaintiffs contend that none of the bilateral treaties entered into in the immediate aftermath of World War II waived individual claims for relief. In the first place, hundreds of thousands of slave laborers or other victims of the Nazi regime were stateless persons unable to return to their native lands for such reasons as political oppression in the totalitarian Soviet Union and its satellite countries and residual anti-Semitism in many areas. No state had authority to waive their claims.

The waivers of claims contained in the 1947 treaties which were imposed on Nazi Germany's military allies, could not, according to plaintiffs, have been intended to destroy the legal rights of those who had been victims of Nazi oppression. Thus the treaties with Romania, Bulgaria and Hungary cannot be treated as a waiver of their nationals' claims against private German corporations.

In 1953 the Soviet Union imposed treaties on the German Democratic Republic (East Germany) and Poland which recognized the end of the punitive nature of reparations against Germany. The Soviet Union agreed to end the physical seizure of German property and disclaimed further reparations. Plaintiffs contend that the Soviet Union could not waive the rights of the displaced persons who never returned to the communist world, nor could a treaty with East Germany, constituting a fraction of greater Germany, constitute a waiver of claims against private corporations in a unified Germany.

As regards the western allies, the method of providing reparations changed fundamentally. In order to ensure an economically viable West Germany and in order to integrate West Germany into the common western defense against an expansionist Soviet Union, the western allies abandoned seizure of industrial assets. Plaintiffs pass over with little mention the Bonn and Paris Agreements signed in 1952 and 1954 (including the Transition Agreement). Instead plaintiffs find support for recognition of their claims in the February 23, 1953, London Debt Agreement which provided in part: "Consideration of claims arising out of the second World War by countries which were at war with or were occupied by Germany during that war, and by nationals of such countries against the Reich and agencies of the Reich ... shall be deferred until the final settlement of the problem of reparations." It is plaintiffs' position that the London Debt Agreement recognizes the existence of individual claims and simply postpones their consideration.

It is defendants' contention that settlement with Germany in the so-called "2 + 4 Treaty" effective March 15, 1991, was a final settlement of the reparation issue. There were no provisions concerning reparations in the 2 + 4 Treaty. From this defendants maintain that the states that are parties to the 2 + 4 Treaty, England, France, the Soviet Union and the United States, have, after conclusion of that agreement, no further claims for themselves and their nationals against the Federal Republic of Germany arising from World War II, and that, viewed in conjunction with the 1952–1954 Bonn and Paris Agreements and the bilateral treaties entered into between 1946 and 1953, all state and private reparation claims against both the Federal German Republic and its private entities such as Degussa or Siemens have been resolved.

Plaintiffs advance four answers to defendants' position; (i) The German Federal Constitutional Court has held that the legal claims of World War II slave laborers were not subsumed by the 2 + 4 Treaty. (ii) Plaintiffs' private law claims for the disgorgement of unjust profits earned by private corporations at plaintiffs' expense

are not claims for war reparations, and thus could not have been subsumed by the 2 + 4 Treaty. (iii) Legal claims by stateless persons seeking relief from violations of customary international law cannot be subsumed by treaty, as no nation has the power to deal with their claims. (iv) Neither the text, nor the history of the 2 + 4 Treaty manifest an intent to subsume plaintiffs' claims.

The most comprehensive and systematic development of plaintiffs' contentions is set forth in the declaration of Privatdozent Dr.Dr.jur.habil. Christian Wolf. Dr. Wolf first comments upon the common failure to recognize the different categories of war claims. This results in the present case in applying principles of international and domestic law and cases applying these laws indiscriminately without distinguishing the kinds of cases to which these laws and cases apply. Consequently, according to him, erroneous conclusions have been drawn.

Dr. Wolf assumes in his analysis that the class actions involved here are based on German law of tort and unjust enrichment. This is to be distinguished from claims arising under international law, although principles of international law may govern the survivability of claims based on national law.

With respect to public international law Dr. Wolf posits four categories of claims: (i) the injured state against the injuring state, (ii) the injured individual against the injuring state, (iii) the injured state against the injuring individual, and (iv) the injured individual against the injuring individual.

With respect to public law, Dr. Wolf initially posits two categories of claims: (i) the injured individual against his or her home state and (ii) the injured individual against the injuring state. Finally there is a third category of public law claims which is the category in which plaintiffs' claims fall, namely, the claim under national civil law of the injured individual against the injuring individuals. It is to this category

of claims that Dr. Wolf primarily directs his analysis.

He notes that German courts have recognized parallelism of claims and that claims of individuals are separate from claims of the state although they may arise out of the same conduct. Dr. Wolf contrasts the destructive financial consequences to the nation of reparations demanded of the state (which cannot be avoided) with recovery against a private company which, if required, can apply for liquidation. In the first instance the entire economy suffers; in the second instance just an individual corporation suffers. Dealing with the third category of individual public law claims, Dr. Wolf explores the questions (i) whether the violation of the law of war by individual participants in the war will lead to responsibility solely on the part of the government and not on the part of the individual, (ii) whether the declarations of waiver in the 1946 Treaty of Paris as well as the unilateral declaration of waiver of Poland of August 23, 1953, can be interpreted to embrace the third category of private claims, (iii) whether the Peace Treaties of 1947 with Hungary, Romania and Bulgaria validly waive claims of citizens who had opposed the oppressing regime, and (iv) whether such a waiver could be legally valid under public international law and German Constitutional law.

Dr. Wolf posits, undoubtedly correctly, that the defendants in these cases, Degussa and Siemens, violated fundamental human rights laws by their utilization of slave/forced labor. He also states that slavery and involuntary servitude have been prohibited in Germany since 1871 and that § 234 of the German Criminal Code prohibits slavery and involuntary servitude under penalty of imprisonment. He assumes that plaintiffs have claims under § 611, § 823 and § 812 of the German Civil Code. Thus any discussion of waiver must address the dual question whether there was a purported waiver of plaintiffs' claims under customary international law

and whether there was a purported waiver of plaintiffs' claims under German law.

With respect to the February 19, 1947, peace treaties which the Allies concluded with Hungary, Romania and Bulgaria, former allies of the Nazi Regime, Dr. Wolf appears to recognize that the language of the treaties, read literally, would constitute a waiver of the nationals of these countries against Germany and German nationals such as Degussa and Siemens: "Romania/Hungary/Bulgaria waives on its own behalf and on behalf of Romanian/Hungarian/Bulgarian nationals all claims against Germany and German nationals outstanding on May 8, 1945, except those arising out of contracts and other obligations entered into, and rights acquired, before September 1, 1939. This waiver is deemed to include debts, all intergovernmental claims in respect to arrangements entered into in the course of the war and all claims for loss and damage during the war."

Dr. Wolf urges that there should be a departure from the literal language of the treaties with Romania, Hungary and Bulgaria, stating "I conclude that the underlying purpose of the peace treaties gives rise to some doubts as to whether the claims of citizens who had opposed the oppressing regime should have been covered by the declarations of waiver of Hungary, Romania and Bulgaria in the Peace Treaties of 1947." Wolf Declaration at 64. He finds room in the language of the treaties for a narrowing interpretation. The "nationals" referred to in the treaties could be construed not to cover those who opposed or were victims of the Nazi regime. The phrase "during the war" "leaves a certain leeway for interpretation and the possibility to restrain the meaning so as to encompass only claims held by former war enemies, i.e. the state itself and its 'usual' citizens, not, however, those citizens opposing the enemy" *Id.* at 63.

Dr. Wolf also addresses the Polish declaration of waiver of August 23, 1957, and the Soviet Union's declaration of waiver of August 23, 1953.

The Polish declaration stated in part: "Regard being had to the fact that Germany has complied with her obligations to effect reparations to a substantial extent already and that an improvement of Germany's economic situation is in the interest of her own peaceful·development, the government of the People's Republic of Poland has taken the decision with effect from January 1, 1954 to waive all claims of reparation."

The Soviet Union's declaration stated: "In agreement with the government of the People's Republic of Poland (with regard to her share in reparations), the Soviet government states that with effect from January 1, 1954 she will completely terminate her drawing of reparations from the German Democratic Republic, whether in the form of delivery of goods or in any other form. The German Democratic Republic is, therefore, released from her obligation to effect payment of reparations, outstanding after January 1, 1954, which, in accordance with the declarations of the Soviet government of May 15, 1950 concerning the reductions of reparation to be effected by Germany to the Soviet Union, amount to 2537 million dollars, calculated with respect to world prices as in 1938."

Seeking to determine whether the term "reparation" as used in the Polish and Soviet declarations included the claims of slave laborers, Dr. Wolf recognized that the word had its origin in the post World War I Treaty of Versailles which incorporated claims of forced laborers in the notion of reparations: "Damages inflicted upon private persons during the war may be included as a head of damage in the state claim· for reparations. Thus, in the annexure to Art. 232(2) of the Treaty of Versailles the damages of private persons resulting from acts of cruelty, violence and maltreatment were included in the claim for reparations, mentioning also injuries to life and health suffered by forced laborers." *Id.* at 67. Given this meaning the reparations waiver of the Polish and Soviet

governments would include claims on account of forced labor.

Dr. Wolf states, however, that the nature of the World War II forced labor claims is entirely different from the post World War I forced labor claims. The latter arose from the typical war situation. The former, on the other hand, arose from a program separate and apart from the German war effort; they were a component of the racial ideology and policies of persecution of the Nazi regime. As such, World War II forced labor claims should not be included in the term "reparations" as used in the Polish and Soviet declarations of waiver.

Elaborating on this point, Dr. Wolf stated: "If one considers the notion of 'reparation' as in relation to World War I and realizes that it also included damages inflicted upon private persons as a consequence of forced labor, it does not necessarily follow from that after World War II all claims of forced laborers were included in the reparation claim. This draws from the fact that the World War II and the accompanying acts of war must be clearly distinguished from the unprecedented acts of extermination of the Nazi regime based on racial motives. The mere temporal coincidence of racial persecution and acts of war cannot lead to the conclusion that these racial acts of persecution constitute typical acts of war and therefore the damages arising out of these acts are covered by the reparation claims. The indirect connection does not justify viewing these damages as war damages. The term 'reparation' must then be understood in its traditional meaning of compensation for war damages as they have always occurred in the past excluding the injustice specific to World War II flowing from racial and ideological persecution under the Nazi regime." *Id.* at 69.

Dr. Wolf finds confirmation of his position in the Transition Agreement of 1954. He notes that the question of "reparations" is dealt with in Part VI of the agreement and Part IV deals with compensation for persons who were injured in their life, body, health, liberty, property and patrimony or their economic progress for reasons of political connection, race, belief or ideology. Dr. Wolf also notes that German courts considering forced labor claims have ruled that the word "reparation" used in the August 1953 Polish and Soviet declarations is different from compensation for injustices in a broader moral sense.

Dr. Wolf's conclusion with respect to the Polish and Soviet declarations is: "I arrive at the conclusion that the nature of 'reparation' must be regarded from the background of the Second World War and the Nazi regime. In this war, injuries were inflicted solely for racial and ideological reasons and far exceeding the scope of atrocities usually occurring during the war. As the damages arising out of these acts cannot be considered to be typical war damages, the notion of 'Wiedergutmachung' (to make good) emerged which limited the scope of the notion of 'reparation.' I conclude that the waivers of Poland and the former Soviet Union do not bar the claims of former forced laborers which were persecuted for reasons of race, religion, political connection or ideology by the Nazi regime." *Id.* at 74.

Dr. Wolf notes the provisions of the 1953 London Debt Agreement which, he asserts, were incorporated into German national law by statute on August 24, 1953. Of particular pertinence, of course, is Art. 5(2) which provides that "[c]onsideration of claims arising out of the second World War by countries which were at war with, or were occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich ... shall be deferred until the final settlement of the problem of reparation." Dr. Wolf does not address the interpretive problems of these provisions. Do the "claims arising out of the second World War" include private claims, such as plaintiffs' claims, against private corporations under international law and/or German

municipal law? Are private corporations such as Degussa and Siemens "agencies of the Reich"? What constitutes a "final settlement of the problem of reparation"? Is the term "claim" to be understood as excluding compensation for "the unprecedented acts of extermination of the Nazi regime based on racial motives"?

With respect to the London Debt Agreement Dr. Wolf states simply: "In Art. 5(2) and (3) of the London Debt Agreement, a legal condition is established: As long as no final settlement of the question of reparations is reached, those claims are suspended. I will not deal with the legal effect of this moratorium on private claims arising out of forced labor in further detail, as the generally held view in German literature and court decisions is that the 2 + 4 Treaty finally following reunification disposes of the question of reparations. As a result, the condition provided for in Art. 5(2), (3) of the LDT is now fulfilled. Foreign forced laborers therefore may nowadays approach German courts to enforce their, until now, suspended claims." *Id.* at 76–77.

Pertinent to Dr. Wolf's subsequent discussion of the validity of any waiver of private claims under municipal law is Art. 5(4) of the London Debt Agreement. It provides that: "Claims against Germany or German nationals by countries which were, before 1st September, 1939, incorporated in, or which were on or after 1st September, 1939 allied to the Reich [such as Romania, Bulgaria and Hungary] and of nationals of such countries [such as a number of the plaintiffs], arising out of obligations undertaken or rights acquired between the date of incorporation (or, in the case of countries allied to the Reich, 1st September, 1939) and 8th May, 1945, shall be dealt with in accordance with the provisions made or to be made in the relevant treaties [such as the 1947 treaties with Romania, Bulgaria and Hungary]."

It is unnecessary to summarize in detail Dr. Wolf's conclusion that under international law more than one state can regulate the question of tort claims arising out of forced labor, including the question whether such claims have been waived. Under the "genuine link principle" a state that is sufficiently connected to the facts to be regulated may adjudicate a claim. There is no exclusive right of a home state to declare a binding waiver affecting a private claim under local municipal law. This principle is true generally and particularly true in the case of claims for compensation arising out of a violation of fundamental human rights. Since the United States is sufficiently connected to World War II claims, Dr. Wolf invites this court to address three questions: (i) Are the laws of Romania, Hungary and Bulgaria applicable according to the rules of the law of conflicts of the United States? (ii) Is the waiver legally binding according to the laws of Hungary, Bulgaria and Romania? and (iii) If binding under the laws of these nations, would such a waiver violate "the order public", the fundamental laws of human rights?

Finally, Dr. Wolf assumes (without accepting) the validity of the various waiver provisions and presents his opinion that the waiver of private rights asserted under municipal law would violate both the German Constitution and public international law.

Art. 5(4) of the London Debt Agreement provided, in effect, that the war time claims of nationals of German allies would be dealt with in accordance with the provisions of the peace treaties with German allies. The peace treaties with Romania, Bulgaria and Hungary waive the claims of their nationals against Germany and its nationals. Literally construed this would constitute a waiver on behalf of the plaintiffs in the instant cases who were nationals of one of those states at the time they were subjected to the violation of their rights under international law and under German law. Germany by statute incorporated the London Debt Agreement and thus accepted the waiver of Romania, Bulgaria and Hungary.

Art. 3 of the German Constitution states:

(1) Everyone is equal before the law

. . .

(3) Nobody may be discriminated against or be treated preferentially on the ground of his gender, his descent, his role, his language, his ethnical and social origin, his belief, his religion, or political ideology. Nobody may be discriminated against on the ground of disability.

Dr. Wolf states that "in terms of German constitutional law, not only Germans but all persons are entitled to the right provided for in Art. 3. To whomsoever acts of state may relate, therefore, they are subject to the equality provision. It is not necessary that the person affected, whether German or foreign national, be physically present on German territory and that the unequal treatment occurs on German territory. The participation of Germany in the waiver of Romania, Hungary and Bulgaria therefore can be measured against German constitutional law." *Id.* at 95–96.

Dr. Wolf reviews several German court decisions which bear upon but do not resolve definitively the question whether German adoption of the Romanian, Bulgarian and Hungarian waiver provisions via acceptance of Art. 5(4) of the London Debt Agreement violated Art. 3 of the German Constitution. Nevertheless, he concludes that: "I think that there can be no doubt that the waiver violates the German Constitutional standard. In order to decide on the validity of the waiver, I must be aware of the underlying facts of the claim: The plaintiffs have, as I assume, suffered unspeakable grief and have been violated in their fundamental human rights. The civil responsibility of the defendants shall provide for a compensation for these human rights violations.... Taking this into account, a regulation which excludes a group of persons from the remedies available to the normal person for a violation of human rights, only for reason of citizenship, must be regarded as unconstitutional" *Id.* at 102–103.

Apart from German constitutional law, Dr. Wolf addresses the question whether the waiver of the claims of forced laborers from Romania, Bulgaria and Hungary was valid under public international law. He referred to the evolving concept of human rights developed after World War II in reaction to the atrocities committed by the Nazi regime. He cited the many declarations and conventions entered into by members of the international community and its organizations, to many of which Germany is a party. Dr. Wolf further characterized the core of rights reflected in these documents as having existed and having been recognized before World War II. stating: "along with liberty, equality is the most important principle embracing and inspiring the concept of human rights.... It follows from this, that the protection of human rights at the relevant time may not be described as rudimentary, particularly as far as the principle of equality is concerned. Therefore, I am of the opinion that Germany, participating in the declaration of waiver, had to observe the principle of equality under public international law." *Id.* at 104–105.

Dr. Wolf summarized his conclusions as follows:

In the peace treaties a waiver of claims is declared. This waiver is not binding for the deciding court. I have elaborated in section (C) that one must distinguish between the claims under international public law (first level) and the claims under municipal law (third level). A waiver on the public international law level would not simultaneously be a waiver on the level of municipal law. I have shown that the claims of the plaintiffs are not interfered with by any rule of the international law of warfare. I have examined that the waiver declared in the peace treaties cannot be understood so as to cover also the claims under municipal civil law arising out of forced labour. In the last section I have

finally proved that a waiver declared on the level of international law could not have more authority than a waiver declared under the municipal laws. According to the German law of conflicts such a waiver under municipal law could not govern the case because this waiver would escape control by the order public. Furthermore, the waiver violates German Constitutional law, particularly the principle of equality.

*Id.* at 105.

The foregoing is a summary of plaintiffs' arguments that their private claims against Degussa and Siemans, private German corporations, survive the various agreements which sought to end the state of war with Germany and her allies and to deal with the question of reparations.

### III. Context of the Post–War Treaties

The submissions of the parties, particularly Dr. Wolf's declaration and the affidavit of Charles W. Sydnor, Jr., Ph.D., contain references to the context in which plaintiffs' claims arose and the context in which the post-war treaties were negotiated. This context bears importantly upon the question whether plaintiffs' claims are justiciable in this court.

The Nazi regime was preeminently a regime of aggression and conquest. In March 1938, by threat of force, it accomplished the Anschluss with Austria, incorporating that nation into Nazi Germany. In September 1938 at Munich Hitler won control of Czech Sudetenland, leaving Czechoslovakia militarily defenseless. The dismemberment of that nation was completed on March 15, 1939, when German troops marched into Bohemia and Moravia, occupied secessionist Slovakia and awarded Ruthenia to German's ally Hungary. On March 23 Germany forced Lithuania to surrender the city of Memel.

On September 1, 1939, World War II began when, protected by the Nazi–Soviet Pact, the Nazi armies invaded and proceeded to crush Poland. England and France declared war on Germany. The Soviet Union seized the half of Poland the Nazi–Soviet Pact had allocated to it, occupied the Baltic nations of Lithuania, Latvia and Estonia, and later invaded Finland.

Its eastern front secured by its pact with the Soviet Union, the Nazi armies turned to the west, first invading Denmark and Norway and in the spring of 1940 falling upon Belgium, the Netherlands and France, crushing all resistance. Northern France was placed under German occupation; the puppet Vichy government controlled southern France and French North African possessions.

Germany's ally, Italy, had previously conquered Albania and attacked but failed to subdue Greece. In the spring of 1941 Germany overwhelmed Yugoslavia and Greece, captured Crete and moved sizeable forces to join the Italian military units in North Africa, threatening Cairo and the Suez Canal.

Having conquered or being allied with all of western Europe except Switzerland, Sweden and the British Isles, the Nazi armies turned east once more. On June 22, 1941, they launched Operation Barbarossa, a massive attack on Germany's erstwhile ally the Soviet Union, driving north through the Baltic countries to the outskirts of Leningrad, pushing due west to the vicinity of Moscow, and in the south occupying the Ukraine and moving on to the Caucasus.

To support this massive military effort required total mobilization of German industry, resulting in the creation of the ultimate military-industrial complex. Every significant industrial concern participated in and no doubt profited from its role in the war effort. The demands on German industry increased after the tide of battle turned, as the Soviet Union's armies counterattacked, pushing the German armies back towards the German frontier, as the western allies invaded northern Africa, Sicily, Italy and northern and then southern France and as German cities, industries and military facilities

came under increasingly heavy daytime and nighttime bombing.

From almost the outset Nazi Germany was short of labor and to supply both agricultural and industrial needs drew upon the occupied nations as sources of forced or slave labor. These laborers first came from the conquered western European countries and later from the vast territories overrun in the east. As described in a recent German law review article which plaintiffs submitted after the hearing on the motions:

> The exact number of forced laborers utilized in agriculture and industry is unknown. It is generally assumed that 14 million forced laborers were deported into the German Reich. The utilization of forced labor in German industry drastically increased after 1942. At that time, it was clear that an increasingly large portion of the German labor force was being drafted into the German military, and that foreign labor would be required to replace German laborers. At first, the labor force was recruited from the western neighboring states. The growing demand for laborers quickly made the forced labor of workers from Poland and Russia necessary. These people were at the bottom of the "Racist Hierarchy". Many of the Poles and Ostarbeiter [Eastern Workers] were violently wrenched from their home countries without even the opportunity to bring any personal goods or appropriate clothing.

Lutz Frauendorf, *Compensation for Nazi Forced Labor, A Contemporary Problem*, J. FOR LEGAL POL'Y, Tuebingen, Jan. 1999.

In addition, as described in plaintiffs' papers, many Jews sent to the concentration camps were selected as slave laborers and designated to work for German industrial concerns, living and working in the abominable conditions recounted in the complaints in these actions.

Simultaneously with these wars of conquest and later during the defense against Soviet and Allied counter assault, Nazi Germany pursued its diabolical program to destroy the entire Jewish community of Europe. The submissions in these cases set forth the sequence of events. Harassment of Jews began well before the commencement of hostilities through segregation, exclusion from professions and business, the November 1938 "Week of Broken Glass", seizure of Jewish businesses and assets, the Nuremberg Laws.

At least as early as the June 1941 invasion of the Soviet Union the decision had been made to physically annihilate the Jewish population. The plans for Barbarossa included special tasks for the Reichsfuehrer SS headed by Heinrich Himmler. Rounding up and killing the Jewish people in the conquered territories in the East was to be accomplished by four Einsatzgruppen, A, B, C and D, special units which were to move directly behind the advancing armies. *See United States v. Kungys*, 571 F.Supp. 1104, 1108–14 (D.N.J. 1983), *rev'd*, 793 F.2d 516 (3d Cir.1986), *rev'd*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988). These units first sought to feed on widespread anti-Semitism and incite local populations to kill the Jews in their midst. When the Germans were unable to incite anti-Jewish pogroms, or when local killing had run its course, the German units themselves carried out mass killings on a gigantic scale.

The complaints and other documentation in the present cases refer extensively to the method of killing more commonly used in the western nations which Germany had occupied, in countries allied with Germany and in Germany itself. Shipped in railroad boxcars Jews from these areas were taken to the concentration camps. There some were pulled out to serve as forced laborers, but the rest, by the millions, died or were killed.

All this could not have taken place without the participation of major elements of German industry. The firms receiving slave laborers must have known the ori-

gins of these workers. Degussa must have known the use to which its Zyklon B was being put and the sources of much of the gold which it was refining for the German authorities.

The zeal with which the program of extermination was being carried out is illustrated by the death marches which took place as Soviet and western Allied troops approached the death camps. Rather than permitting the remaining Jews to be liberated, the camp authorities often forced them to march to areas deemed less threatened by the enemy. Many of the marchers died or were killed en route. Only with the final collapse of Nazi Germany in the spring of 1945 was the program of extermination brought to an end.

In anticipation of the defeat of Nazi Germany the Soviet Union and the three principal western allies, the United States, Great Britain and France had agreed to the partition of Germany into four zones and the division of Berlin into four sectors, each to be occupied and controlled by one of the four powers. At the outset the four powers had agreed that Germany's industrial base would be dismantled and turned over to the victorious powers. This would serve two purposes—reparations for the enormous losses which Nazi Germany had inflicted upon its victims and a means to ensure that Germany would never again have an economic base which would permit it to mount another war.

At the end of the war Germany lay in ruins. Much of its territory had been fought over by the Soviet Union and the armies of the western allies. It had been subjected to relentless bombing. As described in the affidavit of Dr. Sydnor:

> The destruction of the Nazi tyranny and the end of Hitler required a world at arms—an Allied coalition in a life-and-death struggle that commanded the expenditure of humankind's greatest sacrifices in blood and treasure. When the conquering Anglo–American and Soviet armies forced the unconditional surrender of all Nazi forces, they imposed peace upon an exhausted devastated and completely shattered Germany in May 1945.

\* \* \* \* \* \*

For most of the period between 1945 and 1953, there was no German government and there were no German corporations that existed in any kind of form or possessed any measure of assets sufficient to compensate those they had victimized.... In 1946, Germany's industrial and corporate infrastructure lay in ruins; it was not substantially rebuilt until after 1953. Until 1948 and the introduction of the Marshall Plan, Germany and central Europe were in a state of desperate economic collapse. The Russians had stripped most of the surviving industrial plant and productive capacity out of their eastern zone.

Germany was not alone in its desolation. The war had been fought in vast territories of the Soviet Union. Similarly combat had raged in northern France, Belgium and the Netherlands. In addition to physical destruction the economies of the western allies were in tatters.

Another development soon surfaced. The Soviet Union, instead of allowing free elections in the nations which its armies had occupied, established iron control over these nations, creating puppet communist governments as instruments of its control. Thus Poland, Bulgaria, Rumania, Hungary, Czechoslovakia, Yugoslavia and Albania entered the orbit of the Soviet Union. In the Balkans only Greece, occupied by British troops, remained free of Soviet control. To protect Greece from Soviet domination it was necessary for the United States in 1947 to assume a virtually bankrupt Britain's protective role. Thus was born the Truman Doctrine providing aid to Greece and Turkey.

The Soviet Union sought to extend its power into western Europe through the vehicle of local Communist parties. These parties owed their allegiance to the Soviet Union and had great numerical and politi-

cal strength in France and Italy. Their influence increased with the deprivation and economic misery which prevailed in those countries in the years after the war.

The United States Marshall Plan, proposed in 1947, was designed to jump start European recovery. The Soviet Union and its satellites rejected this aid but it became a vehicle of Western European economic recovery, increasing economic and political integration and unity in the face of the threat from the east. It was soon recognized that economic recovery of the three western zones of Germany was critical to the recovery of the rest of western Europe and that a military defense of western Europe was impossible without the participation of West Germany.

Under these circumstances there occurred a fundamental change on the part of the western allies towards their defeated foe. Instead of reducing Germany to a pastoral condition, the German economy, including its industries, was to be revived through the Marshall Plan and by other means. Assurance that Germany was never again to become an aggressor nation was to be obtained by integration of Germany into a strong European community of nations. West Germany was authorized to develop military strength, integrated with the armed forces of NATO.

While these fundamental changes took place the Soviet Union developed its own atom bomb in 1947; in January 1948 Czechoslovakia's western oriented foreign minister was either defenestrated or fell to his death, anticipating February's Red Army supported coup imposing a pro-communist government upon Czechoslovakia; on June 24, 1948, the Soviet Union blockaded access to western Berlin, leading to the Berlin airlift; in June 1950 the Soviet Union's ally North Korea invaded South Korea, precipitating the Korean War; meanwhile the Soviet Union's armed strength, nuclear and missile capability and submarine fleet expanded.

It was against this backdrop that the negotiation of the various reparations agreements took place.

## IV. Agreements Concerning Reparations

**A. *Potsdam Agreement:*** At the Potsdam Conference in the summer of 1945, following the unconditional surrender of the Third Reich in April, the heads of state of the United States, the United Kingdom and the Soviet Union agreed to a reparations formula which implemented the Morgenthau Plan, *i.e.,* the creation of a nonindustrial, pastoral Germany. The formula was designed to extract reparations from Germany, reduce its ability to remilitarize, but at the same time leave sufficient "resources to enable the German people to subsist without external assistance." Protocol of the Proceedings, Berlin (Potsdam) Conference, August 2, 1945, 3 Bevans 1207, Art. (B)(111). Reparation claims were to be satisfied by the allocation to the parties to the Potsdam Agreement of specified percentages of industrial capital equipment and shares of German enterprises.

**B. *Paris Agreement:*** The United States and seventeen other allied nations (including Czechoslovakia) met at the 1946 Paris Reparations Conference to develop a more detailed formula by which they would divide among themselves reparations to be extracted from Germany. Negotiations produced the Agreement on Reparation from Germany, Establishment of Inter–Allied Reparation Agency and Restitution of Monetary Gold, Jan. 14, 1946, 61 Stat. 3157, T.I.A.S. 1655 (the "Paris Agreement").

The Paris Agreement continued the Morgenthau Plan's punitive approach. Its preamble stated the intention of the signatory states "to obtain an equitable distribution among themselves of the total assets which . . . are or may be declared available as reparation from Germany." Paris Agreement at 1, preamble. The Agreement recognized that the dislocations of war had produced a large body of

stateless persons who had been victims of the Nazi regime and "now stand in dire need of aid to promote their rehabilitation but will be unable to claim the assistance of any Government receiving reparation from Germany." *Id.* Art. 8. There was agreement to set aside a percentage of the reparations received by each signatory power to aid the stateless people.

As to the effect upon claims of citizens of the eighteen signatory states the Paris Agreement provided:

> The Signatory Governments agree among themselves that their respective shares of reparation as determined by the present Agreement, shall be regarded by each of them as covering all its claims and those of its nationals against the former German Government and its Agencies, of a governmental or private nature, arising out of the war (which are not otherwise provided for).

*Id.* Art. 2(A).

Under the Potsdam Agreement the amount due to the western allies had been set at approximately 75% of assets in the western zones. The Paris Agreement classified these assets as Category B assets (consisting of dismantled material and merchant and inland ships) and Category A assets (consisting of all other reparation assets including assets abroad). From each category each signatory state was allotted a specified share. The total reparation to be paid by Germany, therefore, was computed on the basis of a proportion of German assets, not on the basis of the total loss of Germany's victims. Among other circumstances demonstrating that the consequences of forced labor were covered by the Agreement was the fact that each signatory state was asked to specify the value which it attached to forced labor of its nationals.

An Interallied Reparation Agency ("IARA") was given the task of ascertaining the value of seized German assets and of dividing these assets among the contracting states.

The parties to the Paris Agreement did not intend that it finally resolve all reparation issues and reserved their rights "with respect to the final settlement of German reparations." *Id.* Art. 2(B)(ii). The final settlement was to be effected through a final multilateral peace treaty or through bilateral agreements signed prior to a final peace treaty.

The IARA proceeded to assess the value of reparation assets. In August 1947 western zone occupying powers agreed to a revised level of industrial development for Germany and prepared a new list of industrial plants affected. According to the revised level, Germany was to achieve roughly the same industrial capacity as it possessed in 1936 instead of the originally designated 75% of the 1936 level. The United States particularly was concerned that the dismantling program not conflict with its efforts to promote European redevelopment. It discovered that keeping Germany in a state of economic collapse required the United States to incur enormous costs for food and other subsistence-level aid.

C. ***Bilateral Peace Treaties:*** In February 1947, the Allied powers concluded bilateral peace treaties with Romania, Hungary and Bulgaria, former allies of Nazi Germany. They have been referred to above in the summary of Dr. Wolf's declaration. These treaties were entered into at a time when a punitive approach to reparations was being pursued pursuant to the Potsdam Agreement and the Paris Agreement, and when the totality of reparation payments was measured by a percentage of German assets. The pertinent language was: "Romania/Hungary/Bulgaria waives on its own behalf and on behalf of Romanian/Hungarian/Bulgarian nationals all claims against Germany and German nationals outstanding on May 8, 1945 except those arising out of contracts and other obligations entered into, and rights acquired before September 1, 1939. This waiver is deemed to include debts, all intergovernmental claims in respect of ar-

rangements entered into in the course of the war and all claims for loss and damage during the war."

**D.** *The Transition Agreement:* Early in the occupation the three western occupying powers imposed upon Germany the obligation to provide for the return of property or payment of value to either the owner or heir or, if there were no surviving heirs to the Jewish Restitution Successor Organization. For example, Law No. 59 on Restitution of Identifiable Property enacted by the United States Military Government in November 1947 was designed "to effect to the largest extent possible the speedy restitution of identifiable property ... to persons who were wrongfully deprived of such property from January 30, 1933 to May 8, 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism." Law No. 59 provided that claims for restitution of identifiable property could be filed by surviving owners of such property or their heirs. Third parties in possession of identifiable property subject to restitution were required to return such property even if they had purchased such property in good faith.

West Germany, or the Federal Republic of Germany, was not a legal entity at the end of the war. Upon the framing of its constitution in 1949 it acquired the capacity to enter upon agreements with other nations. At that time the approach of the western Allies towards Germany was in the process of change; for the reasons set forth in the previous section of this opinion they had determined to integrate the Federal Republic of Germany into the community of free nations and conclude the state of occupation.

This transition was effected during a period of negotiations in Bonn and Paris during 1952 through 1954 and was implemented in a series of agreements including the Convention on the Settlement of Matters Arising out of the War and the Occupation, signed at Bonn on May 26, 1952, as amended by Schedule 4 to the Protocol on the Termination of the Occupation Regime, signed at Paris on October 23, 1954, 332 U.H.T.S. 219 (the "Transition Agreement").

The agreements negotiated in Bonn and Paris consisted mainly of a General Treaty, a Forces Convention, a Financial and Taxation Agreement and the Transition Agreement. They resolved many questions and issues which would normally be dealt with in a final peace treaty. The General Treaty dealt primarily with the ending of the state of occupation, the legal status of Germany and Berlin and the stationing and security of the Allied armed forces. The Transition Agreement dealt with subjects that included claims by and against Germany and its nationals.

Reflecting the decision not to reduce Germany to a pastoral status the United States, the United Kingdom and France agreed "that they will at no time assert any claim for reparation against the current production [*i.e.*, goods and capital generated by private industry] of the Federal Republic." Transition Agreement, ch. 6, Art. 1. Previously responsibility for seeking compensation for the victims of Nazi oppression rested with the occupying powers, which implemented this responsibility by such measures as adoption of Law No. 59 and setting aside in the Paris Agreement a portion of each nation's seized assets for compensation of stateless persons. Under the Transition Agreement responsibility to compensate victims of Nazi oppression was shifted to Germany itself. Germany assumed:

the obligation to implement fully and expeditiously and by every means in its power, the legislation referred to in Article I of [the chapter entitled Internal Restitution] and the programmes for restitution and reallocation thereunder provided. The Federal Republic shall entrust a Federal Agency with ensuring the fulfillment of the obligation undertaken in this Article, paying due regard to the provisions of the Basic Law [the German Constitution].

Transition Agreement, ch. 2, art. 2. Further, the Transition Agreement provided:

The Federal Republic acknowledges the obligation to assure in accordance with the provisions of paragraphs 2 and 3 of this Chapter adequate compensation to persons persecuted for their political convictions, race, faith or ideology, who thereby have suffered damage to life, limb, health, liberty, property, their possessions or economic prospects (excluding identifiable property subject to restitution). Furthermore, persons persecuted by reason of human nationality, in disregard of human rights, who are now political refugees and no longer enjoy the protection of their former home country shall receive adequate compensation where permanent injury has been inflicted on their health.

*Id.* ch. 4. The Transition Agreement established in Germany a Supreme Restitution Court to adjudicate issues under the legislation to be enacted. *Id.* ch. 2, art. 6.

This new dispensation abandoned payment of reparations through seizure and distribution of German assets. Instead it contemplated compensation of Nazi victims through legislation enacted in Germany and adjudicated by a German court as well as through state-to-state agreements. As in the past, it was recognized that the victims of Nazi oppression could never be fully compensated for their losses. Germany assumed the obligation to provide "adequate" compensation. "The Federal Republic acknowledges the obligation to insure ... *adequate compensation to persons persecuted for their political conclusions, race, faith or ideology, who thereby suffer damage to life, limb, health, liberty, prosperity, their possessions or economic prospects.*" *Id.* ch. 4, art. 1. Recognizing that reparations had to be limited to Germany's ability to pay, the Transition Agreement provided: "The capacity to pay of the Federal Republic may be taken into consideration in determining the time and method of compensation payments ... and in providing adequate funds." *Id.* ch. 4(3).

The Transition Agreement was not a final resolution of reparation claims of the Western Allies. Rather, "the problem of reparation shall be settled by the peace treaty between Germany and its former enemies or by earlier agreements concerning the matter." *Id.* ch. 6, art. 1.

**E. *London Debt Agreement:*** Disagreement about plans for a European Defense Community delayed the effective date of the Transition Agreement until May 6, 1955. In the meantime in pursuit of the policies which produced the Transition Agreement, the United States, France, Great Britain, eighteen other Allied nations and the Federal Republic of Germany concluded the Agreement on German External Debts, February 27, 1953, 4 U.S.T. 444 (the "London Debt Agreement").

The London Debt Agreement addressed and regulated certain categories of German debts—some from the First World War, some from the inter-war period, some from World War II and some from the post-war period. Article 4 covered debts to be settled and Article 5 set forth "claims excluded from the agreement." Paralleling provisions of the Transition Agreement, Article 5(2) of the London Debt Agreement provided:

(2) Consideration of claims arising out of the second World War by countries which were at war with or were occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich ... shall be deferred until the final settlement of the problem of reparation.

The London Debt Agreement, like the Transition Agreement, was designed to stabilize the German economy and integrate it into the community of free nations, thus furthering overall European prosperity and strengthening the military forces standing in the way of Soviet expansion. Thus provision was made for payment of certain debts and the postponement of consideration of other debts, the effect of

which would be to enable Germany to obtain foreign credit. The London Debt Agreement, although it deferred further consideration of World War II reparation claims, did nothing to change the provisions for reparations contained in the Transition Agreement, which did not go into effect until after execution of the London Debt Agreement.

**F. Soviet and Polish Waivers:** The Soviet Union was a party to the Potsdam Agreement pursuant to which all reparation claims were to be satisfied by the allocation to the parties to the Potsdam Agreement of specified percentages of industrial capital equipment and shares of German enterprises. The Potsdam Agreement awarded reparation to the Soviet Union out of the Soviet occupation zone and the German assets in Eastern Europe. In addition, 25% of the industrial equipment from the Western Zone was to be delivered to the Soviet Union. Only a limited amount of equipment from the Western Zone was in fact turned over to the Soviet Union.

On August 15, 1953, the Soviet Union declared in a note to the Western powers that: "Germany had already fulfilled most of its financial and economic obligations to the U.S.S.R., France, Great Britain and the U.S.A." and proposed that Germany (not just East Germany) be released from all further reparation obligations effective January 1, 1954. On August 22, 1953, the Soviet Union and the German Democratic Republic (East Germany) signed the protocol previously referred to above in which the Soviet Union agreed that: "The German Democratic Republic is, therefore, released from her obligation to effect payment of reparation, outstanding after January 1, 1954."

Similarly on August 23, 1953, the government of Poland agreed that: "Regard being had to the fact that Germany has complied with her obligations to effect reparations to a substantial extent already and that an improvement of Germany's economic situation is in the interest of her own peaceful development, the government of the People's Republic of Poland has taken the decision with effect from January 1, 1954 to waive all claims of reparations."

The question arose whether the 1953 Soviet and Polish waivers applied to individual claims of forced laborers. Plaintiffs rely on relatively recent exchanges as evidence that such claims were not waived. In 1993 Germany and the Russian Federation entered into a compensation arrangement through the vehicle of a Reconciliation and Understanding Foundation. A March 30, 1993, note of the Russian Federation with respect to the Foundation closes with the sentence: "Both governments agree, that this creates no limitation of the rights of citizens of both nations." An October 16, 1991, agreement between Poland and Germany establishing a Polish–German Reconciliation Foundation provides that: "The government of the Republic of Poland will assert no further claims of Polish citizens that arose in connection with Nazi persecution. Both governments understand that this creates no limitations of the rights of citizens of both nations."

**G. Implementation of the Transition Agreement:** West Germany, and later a unified Germany, proceeded to fulfill its obligations under the Transition Agreement "to insure . . . adequate compensation to persons persecuted for their political convictions, race, faith or ideology." It did this by means of domestic legislation and bilateral treaties. It was the responsibility of the other parties to the Transition Agreement to ensure that the compensation was "adequate", taking into consideration "[t]he capacity to pay of the Federal Republic."

Reference has already been made to the laws for the restitution of seized property which the occupying powers enacted during the years immediately following the war. These laws were designed to ensure that victims of Nazi persecution would re-

ceive restitution of property confiscated or expropriated from them under the Nazi regime or, if the property were no longer identifiable, compensation for its value. The property included real estate, interests in commercial businesses, gold, jewelry and bank accounts. Claims could be filed by owners or their heirs. If, as was often the case, there were no surviving heirs, assets or compensation was to be remitted to "Jewish successor organizations." For example, the Jewish Restitution Successor Organization ("JRSO") was authorized to conduct investigations and to recover unclaimed property in the United States Occupation Zone.

After adoption of the Transition Agreement the Federal Republic of Germany adopted on July 19, 1957, the Federal Law on the Settlement of Restitutionary Monetary Obligations of the German Reich and Equivalent Legal Entities ("BruG"). This enactment was designed to carry forward and formalize the previously established restitution programs. Pursuant to BruG individual claimants were authorized to present claims and successor organizations asserted claims on behalf of heirless victims. As of January 1, 1998, the Federal Republic had paid out a total of nearly DM 4 billion under occupation programs and BruG on account of seized property. These payments were made to successor organizations, individuals and as hardship payments.

Pursuant to the Transition Agreement the Federal Republic enacted compensation laws culminating in the Third Federal Law of Compensation of Victims of Nazi Oppression of June 29, 1956 ("BEG"). Residency requirements were imposed, but Nazi victims meeting the residency criteria could seek compensation for such injuries as death, physical injury, property damage, financial loss and loss caused to professional or economic life. Slave or forced labor was not an injury for which compensation could be sought per se, but injuries such as death or physical harm flowing from forced labor might be compensable.

A 1965 amendment to BEG extended the claims deadline to December 31, 1969, primarily to benefit stateless persons.

More than four million claims have been submitted under BEG, and as of January 1, 1998, approximately DM 78.4 billion has been paid under BEG and predecessor laws, an additional DM 1.3 billion having been paid in 1998.

In addition to the enactment of legislation the Federal Republic has entered into numerous treaties and agreements under which it has paid compensation on account of Nazi victims. On September 10, 1952, it entered into the Luxembourg Agreement with the State of Israel. To assist in the resettling of 500,000 destitute Jewish refugees displaced from German and formerly German controlled areas, the Federal Republic agreed to deliver to Israel goods and services worth DM 3 billion in fourteen yearly installments. Pursuant to the Luxembourg Agreement the Federal Republic executed two agreements with the Jewish Claims Conference known as Hague Protocol 1 and Hague Protocol 2. Under Hague Protocol 2 the Federal Republic paid DM 450 million to the Claims Conference for the support, assimilation and resettlement of Jewish victims of Nazi oppression.

In the late 1950's and early 1960's the Federal Republic concluded twelve treaties with western European countries pursuant to which the Federal Republic provided funds to those countries for distribution to their nationals who had been victims of the Nazis. Payments under these treaties amounted to DM 977 million.

In 1980 the Federal Republic and the Claims Conference established a Hardship Fund in response to the large number of Jews who were permitted to emigrate from the Soviet Union and other Eastern European countries during the period of detente. These persons had not been able to apply for compensation before the filing periods had expired and the Hardship Fund provided a measure of relief for

them. A total of DM 535 million was turned over to the Claims Conference for this purpose.

Upon the reunification of Germany in 1990 the Federal Republic enacted the law on the Settlement of Open Property Questions. This law governs the restitution of Jewish assets in former East Germany and names the Claims Conference as the successor organization responsible for heirless Jewish property in former East Germany.

After the end of the Cold War the Federal Republic extended its compensation policy to nations of the former East Bloc. It entered into agreements with Poland, Belarus, the Russian Federation and the Ukraine providing for the payment to those countries of sums totaling DM 1.5 billion for distribution to victims of Nazi persecution.

Additional agreements have been entered into: (i) an agreement for payment of DM 200 million to the Claims Conference for the benefit of Jewish victims still living in Eastern Europe: (ii) an agreement to enable the Red Cross to distribute DM 80 million for victims of Nazi oppression living in southeastern European countries such as Yugoslavia, Hungary, Romania, Bulgaria and Slovakia; (iii) creation of a DM 1.6 billion fund to be administered by the Claims Conference for the benefit of Jewish victims who had been unable to apply for compensation because they were living in Eastern Europe and emigrated to the West after the expiration of claim deadlines; (iv) a 1992 agreement with the United States on the Settlement of Certain Property Claims of United States Citizens arising out of confiscation of assets by Nazis and Communist authorities within the Territory of former East Germany; (v) a September 1995 agreement with the United States (the "Princz Agreement") to provide funds to the United States for the compensation of victims who were United States nationals when they suffered persecution and (vi) a 1996 Second Supplemental Social Security Agreement with the United States providing for payment of

German social security benefits to Jews from Eastern Europe with a German cultural background who settled in the United States after fleeing their Nazi occupied homelands.

Munificent as these programs may seem, plaintiffs have submitted documentation pointing our their gaps and inadequacies. This documentation includes the declarations of two legal experts, Deborah M. Sturman, Esq. and Michael Wills, Esq.

Evaluation of the adequacy of the compensation provided under the German legislation, treaties and agreements depend upon one's perspective. Plaintiffs point out the gaps in coverage, the existence of classes of victims and kinds of atrocities for which no compensation is provided. They note the minimal nature of the compensation when compared to the magnitude of the losses sustained. They note the wealth of the corporations which benefited from their participation in the Nazi persecution and the failure of these corporation to provide any compensation whatsoever:

The FRG compensation programs were a patchwork of health related and restitution programs that never covered the types of claims that are being made by plaintiffs. Also, a large number of the Class members were excluded from the BEG due to residence and domicile requirements of Section 4 of the Act. The compensation/restitution programs suffered from two other significant limitations. First, the BruG law limited claims to those persons residing, where applicable, in countries that had a diplomatic relationship with Germany, excluding thousands of possible claims which are at issue in this litigation. Second, the programs had deadlines for filing claims, preventing persons *ignorant* of the compensation/restitution programs, e.g., those who lived behind the Iron Curtain, from filing timely claims. Thus, the reparation laws, especially the BEG, addressed only a portion of the injustice of the Nazi regime's "systemat-

ic extermination economic activities," and did not absolve these private defendants for any liability for their misconduct.

Plaintiffs' Joint Memorandum in Opposition to Siemen's Motion to Dismiss, at 63–64.

On the other hand, a United Nations report published in 1993 reviewed the scope of the German compensation scheme and concluded that: "The most comprehensive and systematic precedent of reparation by a government to groups of victims for redress of wrongs suffered is provided by the Federal Republic of Germany to the victims of Nazi persecution." Study Concerning the Right to Restitution, Compensation and Rehabilitation for Victims of Gross Violations of Human Rights and Fundamental Freedoms, ¶ 107, United Nations Economic and Social Council E/CN, 4/Sub. 2/1993/8, dated July 2, 1993.

**H.** *The 2+4 Treaty:* The series of agreements between Germany and the victorious powers resolving the problems arising out of World War II, including reparations, culminated in the Treaty on the Final Settlement with Respect to Germany, September 12, 1990, 29 I.L.M. 1196 (the "2+4 Treaty"). Parties to the Treaty were the Soviet Union, France, Great Britain and the United States on the one hand and East Germany and West Germany on the other. The Treaty became effective as of March 15, 1991, by which time unification of the Federal Republic of Germany and former East Germany had occurred.

The 2+4 Treaty did not abrogate previous agreements concerning reparations and did not itself add any additional provisions concerning that subject. The totality of reparations, therefore, was represented by the assets seized after the War and the provisions which Germany made and is making pursuant to the Transition Agreement, namely, compensation through the German statutory framework and lump sum payments pursuant to bilateral agreements to other nations and to Jewish successor organizations.

**V.** *Justiciability of Plaintiffs' Claims*

**A.** *Existence of Plaintiffs' Claims:* Plaintiffs in these actions assert claims on behalf of victims of the holocaust for gold and other valuables seized from the victims and refined by Degussa and on account of Zyklon B which Degussa manufactured for use in the death camps and on behalf of all persons whom Degussa and Siemens employed as slave laborers. The briefs, exhibits and oral arguments have addressed almost exclusively the claims on behalf of slave laborers, barely mentioning the claims relating to the refining of the seized gold and to the manufacture of Zyklon B. Most likely the reason for this is that the slave labor claims can more readily be viewed as falling within Dr. Wolf's third category of public law claims, that is, the claim of an injured individual against the injuring individual under civil law. Disposition of the forced labor claims will govern disposition of the other claims. This discussion, like ·the briefs, will be directed primarily to the slave labor claims.

Although in early submissions certain of the plaintiffs referred to New Jersey substantive law, they no longer rely on New Jersey's tort or contract law. Their claims arise under customary international law and German civil law. The German civil law will be discussed in a different context in this opinion. Suffice it to say at this point that plaintiffs have submitted affidavits of distinguished legal authorities opining that the actions of defendants as alleged in the complaints violated provisions of the German civil law. German courts have yet to resolve definitively the effect of the various post-war treaties upon the continued existence of these claims, but for present purposes it will be assumed that plaintiffs' legal experts are correct in their opinions that these claims still exist and may be enforced in German courts.

None of the parties dispute that the horrors inflicted upon the inmates of the

concentration camps and upon forced laborers violated customary international law as it existed before, during and after World War II. Plaintiffs do not rely upon any particular treaty and are not confronted with the objection that treaties are not self-executing. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979). They cite various treaties simply as evidence of the fundamental principles or norms of customary international law:

> In the twentieth century the international community has come to recognize the common danger posed by the flagrant disregard of basic human rights and particularly the right to be free of torture. Spurred by the Great War, and then the Second, Civilized Nations have banded together to prescribe acceptable norms of international behavior.... In the modern age, humanitarian and practical considerations have combined to lead nations of the world to recognize that respect for fundamental human rights is in their individual and collective interest. Among the rights universally proclaimed by all nations, as we have noted, is the right to be free of physical torture. Indeed, for the purposes of civil liability, the torturer has become—like the pirate and slave trader before him—hostis humani generis, an enemy of all mankind.

*Filartiga v. Pena–Irala,* 630 F.2d 876, 890 (2nd Cir.1980).

United States courts have applied customary international law in actions in which individuals have brought claims against individuals or corporations, seeking damages for torture or other egregious conduct. *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.), *reh'g denied,* 74 F.3d 377 (2d Cir.), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996); *Filartiga,* 630 F.2d at 890; *Jama v. U.S. Immigration and Naturalization Serv.,* 22 F.Supp.2d 353 (D.N.J.1998). Those cases, however, relied for jurisdiction upon, and applied international law pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350.

It was unnecessary in those cases to determine whether customary international law constitutes federal common law and, if so, whether 28 U.S.C. § 1331 vests a federal court with "arising under" jurisdiction over a claim sounding in customary international law. In the present case jurisdiction is based alternatively upon diversity of citizenship and thus it is not necessary for jurisdictional purposes to determine whether customary international law has become (or always was) a part of the federal common law. It will be assumed for the purposes of this opinion that if a federal court had jurisdiction over a claim of one private party against another private party it could apply customary international law to resolve that claim. This assumption is not in contradiction to cases defendants have cited representing efforts to impose liability on governmental entities in the face of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1601, et seq.; *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); *Princz v. Federal Republic of Germany,* 26 F.3d 1166 (D.C.Cir. 1994), *cert. denied,* 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995).

**B. *Status of Private Claims in Reparations Context:*** Thus it is assumed, and most likely is the case, that plaintiffs at one time at least had enforceable claims against the defendants arising from the forced labor which defendants inflicted upon them. These claims, however, unlike the claims in *Kadic, Filartiga* and *Jama,* arose in the context of a six year war and, as described above, arose from corporate action constituting an integral part of Germany's war effort. Under international law claims of private citizens arising out of war hostilities are treated differently from claims arising in other contexts.

Under international law claims for compensation by individuals harmed by war-related activity belong exclusively to the state of which the individual is a citizen. Early in the nations's history the Supreme Court affirmed this principle. In

*Ware v. Hylton,* 3 U.S. 199, 3 Dall. 199, 1 L.Ed. 568 (1796), Justice Chase addressed the Treaty of 1783 that concluded the Revolutionary War. Two principles emerged: (i) The war-related claims of individual citizens can be asserted only by their government and (ii) all war-related claims, including those not explicitly addressed, are extinguished by the peace settlement:

> I apprehend that the treaty of peace abolishes the subject of the war, and that after peace is concluded, neither the matter in dispute, nor the conduct of either party, during the war, can ever be revived, or brought into contest again. All violences, injuries, or damages sustained by the government, or people of either, during the war, are buried in oblivion; and all those things are implied by the very treaty of peace; and therefore not necessary to be expressed. Hence it follows, that the restitution of, or compensation for, British property confiscated, or extinguished, during the war, by any of the United States, could only be provided for by the treaty of peace; and if there had been no provision, respecting these subjects, in the treaty, they could not be agitated after the treaty, by the British government, much less by her subjects in courts of justice.

3 U.S. at 230.

These principles have been further articulated in scholarly works:

> [A] state's claim for violations that cause injury to rights or interests of private persons is a claim of the state and is under the state's control. The state may determine what individual remedies to pursue, may abandon the claim, or settle it. The state may merge the claim with other claims with a view to an en bloc settlement. The claimant state may set these claims off against claims against it by the respondent state. Any reparation is, in principle, for the violation of the obligation to the state, and any payment made is to the state.

RESTATEMENT [THIRD] OF FOREIGN RELATIONS, § 902 cmt. (h)(I) (1987). In the words of Professor Henkin:

> [I]n international law the individual and his debt have no independent existence: his claim is only a right of his government against that of the debtor. For international law and diplomacy, then, what begins life as a debt between individuals of different nationality is, or becomes, automatically a debt between governments, and governments have dealt with such private claims as their own, treating them as national assets and as counters in international bargaining.

LOUIS HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 262 (1972); *see also,* E. BORCHARD, THE DIPLOMATIC PROTECTION OF CITIZENS 251 (1915).

Each side in the present cases has sought support in *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). The plaintiff in that case had sued the Iranian government and certain other entities in a United States District Court, obtaining an attachment against the property of defendants and certain Iranian banks. A treaty between the United States and Iran settling the embassy hostage crisis terminated all litigation between each government and the nationals of the other government, requiring that their claims be settled by arbitration before a claims tribunal. Attachments and judgements in American proceedings were nullified and the United States required Iranian assets held by United States banks to be transferred and deposited to secure asserted claims. In a suit for declaratory judgment and an injunction against the United States and the Secretary of the Treasury plaintiff challenged this nullification of its judgment and attachment.

The Supreme Court held that Congress had authorized the President's actions: "Such orders permit the President to maintain the foreign assets at his disposal

for use in negotiating the resolution of a declared national emergency. The frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country." 453 U.S. at 673, 101 S.Ct. 2972. The Court noted that claimants who were deprived of their remedies in United States Courts were provided an alternative means of relief. It stated "[w]e do not think it appropriate at the present time to address petitioner's contention that the suspension of claims, if authorized, would constitute a taking of property in violation of the Fifth Amendment to the United States Constitution in the absence of just compensation." *Id.* at 688, 101 S.Ct. 2972.

Plaintiffs rely upon *Dames & Moore* to support Dr. Wolf's position that even if the various international treaties were interpreted to nullify plaintiffs' claims against private corporations, principles of international law would preclude giving this effect because plaintiffs' were provided with no alternative form of compensation. Defendants rely upon *Dames & Moore* to support existence of a nation's plenary power over private claims of its nationals. Suffice it to say, the circumstances in which *Dames & Moore* arose were totally different from the circumstances in which plaintiffs' claims arose and in which their claims were addressed. *Dames & Moore* did not involve a total war and negotiation of reparations. Its holdings are of limited usefulness in the present case.

Plaintiffs challenge the contention that the slave labor claims are the kind of war related claims that are subject to reparations and thus within the total control of the claimant's state. History and the course of negotiations after World War II do not support plaintiffs' position.

Beginning with the Versailles Treaty concluding World War I, the term "reparations" has been deemed to refer to "all the loss and damage to which ... Governments and their nationals have been subjected as a consequence of the war imposed upon them." Treaty of Peace Between the Allied and Associated Powers and Germany, June 28, 1919, Art. 231, 1 Bevans 43, 137–38. Specifically, "reparations" include "[d]amages caused to civilians by being forced by Germany or her allies to labour without just remuneration." *Id.* Art. 232 Annex I, § 8, 2 Bevans 142.

Plaintiffs' expert, Dr. Wolf, noted the origin of the inclusion of forced labor as a component of reparations to be negotiated and settled by the victorious states: "The notion of reparation developed after World War I and replaced the term 'Kriegsentschadigung' (indemnisation). Contrary to the notion of indemnisation, which is morally indifferent, the notion of 'reparation' contains the aspect of moral guilt for the wrong under public international law committed by the aggressor state. The development of the notion of reparation must be seen in the light of Art. 231 of the Treaty of Versailles, which held the aggressor guilty under public international law." Wolf Declaration, at 66–67.

Further, Dr. Wolf describes how use of forced laborers was treated at Versailles and thereafter as a subject of reparation: "Damages inflicted upon private persons during the war may be included as a head of damage in the state claim for reparation. Thus, in the annexure to Art. 232(2) of the Treaty of Versailles the damages of private persons resulting from the acts of cruelty, violence and maltreatment were included in the claim for reparations, mentioning also injuries to life and health suffered by forced laborers. Therefore, it is sometimes stated that the Treaty of Versailles proves that in treaty practice, claims of forced labourers are covered by the notion of 'reparation.'" *Id.* at 67

Dr. Wolf argues that in the context of World War II forced labor claims are different from forced labor claims arising out of World War I and should not be included in reparation claims. He suggests that "World War II and the accompanying acts of war must be clearly distinguished from

the unprecedented acts of extermination of the Nazi regime based on racial motives. The mere temporal coincidence of racial persecution and acts of war cannot lead to the conclusion that these racial acts of persecution constitute typical acts of war and therefore the damages arising out of these acts are covered by the reparation claims. The indirect connection does not justify viewing these damages as war damages. The term 'reparation' must thus be understood in its traditional meaning of compensation for war damages as they have always occurred in the past excluding the injustice specific to World War II flowing from racial and ideological persecution under the Nazi regime." *Id.* at 69.

This distinction, if valid, would be applicable only to a small portion of slave laborers and not justify treating the forced labor program differently after World War II. It is true that the plaintiffs in the present cases who were subjected to forced labor were seized from concentration camps and were victims of racial persecution. They purport to represent, however, all forced laborers, not just those who were the subject of racial persecution. Plaintiffs' submissions establish that the forced labor program was primarily an act of war designed to enable the Third Reich to pursue its war of conquest and later its defense against its advancing enemies. At first forced laborers were recruited from the conquered western states, *e.g.*, France, Belgium and the Netherlands. Then huge numbers were taken from Poland and Russia. The article from the Journal for Legal Policy estimated that fourteen million forced laborers were deported into Germany during the course of the war. Plaintiffs' expert, Dr. Sydnor, reports that by April 1945, at the war's end, there were at least five million foreign workers and slave laborers in Germany. Many victims in the concentration camps were thrust into the forced labor program and, like millions of others, treated abominably, but that did not change the nature of the program as primarily a war related effort, subject to reparations as negotiated by the victorious nations.

Plaintiffs do not seriously dispute the principle of international law that in the context of negotiation of a peace treaty nations have complete control of the claims of their citizens:

> Plaintiffs have no quarrel with Degussa's assertion that, ordinarily, a peace treaty subsumes the legal claims of individuals against a defeated nation. Plaintiffs agree, as well, with Degussa's observation that nations may eliminate the legal claims of their nationals against other nations, and, under certain limited circumstances (subject to challenge), against private defendants.

Plaintiffs' Joint Memorandum in Opposition to Defendants' Motion to Dismiss, at 5–6. As correctly posed by plaintiffs, "the issue in this case is not what governments may do as a matter of theory, but with what the international community has *actually* done in connection with the assertion of wartime claims against private German corporations."

**C.** *Effect of Post War Treaties:* In a preceding section of this opinion the various agreements dealing with reparations were described. It is now necessary to review each agreement from the Potsdam Agreement of 1945 to the 2 + 4 Treaty of March 15, 1991, which constituted the final settlement with regard to Germany to determine their effect upon plaintiffs' wartime claims against the private German corporations, Degussa and Siemens.

The Potsdam Agreement contemplated that all of Germany would be reduced to a pastoral economy without the industrial capability to wage another war. To achieve this end and also to satisfy reparation claims the heads of state of the United States, the United Kingdom and the Soviet Union agreed to allocate to the parties to the Agreement specified percentages of industrial capital equipment and shares of German enterprises. The Soviet Union agreed that Poland's reparations claims would be satisfied by a portion of the

assets allocated to the Soviet Union. Poland and the Soviet Union subsequently acknowledged that arrangement by treaty.

None of the parties contest the fact that the "reparations" referred to in the Potsdam Agreement included all claims, both government and private, against German state and private entities. This had to be the case because the assets from private industry (such as were left after the destruction of total war and except for the residual needed for German subsistence) were to be seized, leaving nothing from which either the state or private entities could pay additional reparations.

Reduction of Germany to a pastoral economy remained the objective of the eighteen allied nations (including a still democratic, western oriented Czechoslovakia) which at the 1946 Paris Reparation Conference negotiated the Paris Agreement. They developed a formula "to obtain an equitable distribution among themselves of the total assets which ... are or may be declared available as reparation from Germany." Recognizing that the war had produced a large body of stateless persons who had been victims of Nazi persecution each signatory power agreed to set aside a percentage of their reparations to aid the stateless people.

Paralleling the understanding implicit in the Potsdam Agreement, each signatory power agreed that "their respective shares of reparations ... shall be regarded by each of them as covering all its claims and those of its nationals against the former German Government and its Agencies, of a governmental or private nature, arising out of the war." The parties to the Paris Agreement reserved their rights "with respect to the final settlement of German reparations" which were to be effected through a final multi-lateral peace treaty or through bilateral agreements signed prior to a final peace treaty.

Like the Potsdam Agreement, the Paris Agreement dealt with all reparations claims, including those of private parties against German private parties. As plain-

tiffs' counsel stated at the hearing on defendants' motions, "if the Paris Treaty had remained in effect, if nothing had happened after that 1946 Paris Treaty, there would have been no private claims. There would have been no private claims because the regime of the Paris Treaty was the regime that, like the annihilation of the German industrial complex and the use of its [possessions] to compensate private individuals." Hearing Transcript at 30.

Immediately after execution of the Paris Agreement Romania, Hungary and Bulgaria each waived "on its own behalf and on behalf of [its] nationals all claims against Germany and German nationals outstanding on May 8, 1945 (except claims arising before September 1, 1939)". The waived claims included those "for loss and damage during the war." Dr. Wolf's suggestion that this language might be interpreted as not including claims for forced labor is not persuasive.

Thus, in 1947 all governmental and private claims against Germany and German nationals had either been waived or were to be compensated out of the assets seized from Germany.

It is plaintiffs' contention that the London Debt Agreement of 1953 changed all this, carved out claims of private persons against German corporations, and provided that those claims could be brought after reparations issues were finally resolved. As stated in plaintiffs' principal brief: "In fact, in the London Debt Agreement of 1953, the international community adopted a sensible plan that: ... (3) preserved (but deferred) the claims of private persons against German corporations until the close of the reparations negotiations." at 6, and again, "[i]n 1953, the international community temporarily relieved German corporate defendants of the burden of responding to individual claims arising out of World War II in order to permit them to regain their financial health." at 9. Plaintiffs' theory totally ignores the Transition Agreement of 1954 which dealt extensively

and definitively with reparations and misconstrues the London Debt Agreement which dealt primarily, as its name implies, with the restructuring of German debt.

The Transition Agreement and the circumstances producing it have been described above. It was a part of a series of agreements negotiated in Paris and Bonn in 1952 through 1954 designed to end the occupation of Germany and refine the reparation formula in order to incorporate Germany into the body of free nations and to enlist it as an ally against the Soviet threat in the east. To implement these objectives it was necessary to encourage, not prevent, German economic and industrial growth, and therefore the United States, the United Kingdom and France agreed "that they will at no time assert any claim for reparation against the current production [*i.e.*, goods and capital generated by private industry] of the Federal Republic." Transition Agreement. Ch. 6, Art. 1.

The means of providing reparation to victims of Nazi oppression was shifted from levies on seized assets to German initiated reparations programs. Under Ch. 2, Art. 2 of the Transition Agreement. Germany was obligated to adopt legislation and establish programs and judicial bodies to provide restitution. In Ch. 4 of the Transition Agreement "[t]he Federal Republic acknowledges the obligation to assure ... adequate compensation to persons persecuted for their political connections, race, faith or ideology, who thereby have suffered damage to life, limb, health, liberty, property, their possessions or economic prospects.... Furthermore, persons persecuted by reason of nationality, in disregard of human rights, who are now political refugees and no longer enjoy the protection of their former country shall receive adequate compensation where permanent injury has been inflicted on their health."

As in the past, it was recognized that the victims of Nazi oppression could never be fully compensated for their losses. Germany assumed the obligation to provide through legislation and bilateral agreements "adequate" compensation. The Transition Agreement recognized that reparations had to be limited to Germany's ability to pay. It was not a final resolution of reparations claims. The parties agreed that "the problem of reparations shall be settled by the peace treaty between Germany and its former enemies or by earlier agreements governing the matter." *Id.* Ch. 6, Art. 1.

■ Although the method of providing reparations changed, there was no indication that the claims covered by the agreed upon reparations changed. To the extent that the Potsdam and Paris Agreements subsumed private claims against Germany and German nationals, so also the Transition Agreement subsumed those claims. The private claims on account of forced labor were subsumed by the Potsdam and Paris Agreements; they were equally subsumed by the Transition Agreement, and it is to the remedies, if any, provided pursuant to the Transition Agreement through German legislation or bilateral agreements that private parties seeking relief were to look.

The London Debt Agreement of 1953 does not change this result. It was being negotiated during the same period that the Transition Agreement was being negotiated and dealt with different problems. To facilitate German access to capital markets among other objectives, the London Debt Agreement addressed and regulated certain categories of German debt. It excluded from its provisions certain claims, including reparations claims. Its Article 5(2) excluded reparations in language which paralleled the language of the Transition Agreement: "Consideration of claims arising out of the second World War by countries which were at war with or occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich ... shall be deferred until the final settlement of the problem of reparation."

The Transition Agreement was finalized in 1954, a year after the execution of the London Debt Agreement. It is inconceivable that its provisions were modified in any way by the London Debt Agreement. There is nothing in the language or the subject matter of the London Debt Agreement to support plaintiffs' contention that "[i]n 1953, the international community temporarily relieved German corporate defendants of the burden of responding to individual claims arising out of World War II in order to permit them to regain their financial health."

As described above Germany proceeded to fulfill its obligation under the Transition Agreement through legislation and bilateral agreements. Plaintiffs have correctly described the gaps in the national groups benefitting from the German program and the failure to provide compensation for some kinds of Nazi victimization, such as forced labor per se. This may raise the question whether Germany is in compliance with the Transition Agreement with respect to "adequate compensation" as related to "[t]he capacity to pay of the Federal Republic." Adequate or not, the Transition Agreement and the bilateral agreements executed pursuant to it, represented the substance of reparations imposed on Germany, including in their coverage war-related private claims against Germany and its nationals.

As noted above the Transition Agreement left open the possibility of further reparation provisions, "the problem of reparations shall be settled by the peace treaty between Germany and its former enemies or by earlier agreements concerning the matter." There were earlier bilateral agreements and the final peace treaty, the 2 + 4 Treaty, was executed in 1990. No further provisions concerning reparations were contained in the 2 + 4 Treaty. This left the Transition Agreement and the bilateral treaties as the last word on reparations.

As recounted above, from the outset negotiations concerning reparation claims, both with the western and eastern bloc nations, included within the term "reparations" claims of individuals both against the German state and against German nationals. That never changed from the Potsdam Agreement to the Paris Agreement, to the Transition Agreement and finally to the 2 + 4 Treaty. At the outset plaintiffs posed the question: "What [has] the international community [ ] *actually* done in connection with the assertion of wartime claims against private corporations?" An examination of the applicable treaties establishes that the international community has subsumed those claims and agreed that the remedies, if any, lie in German legislation and the bilateral agreements that flowed from the Transition Agreement. .

**D. *The German Cases:*** Plaintiffs rely upon a number of cases in which German courts have wrestled with questions concerning the viability of individual claims for wartime forced labor against the German government and against private German corporations. At the outset it should be noted that recognition by German courts of claims of individuals against either the German government or against private German corporations would be completely consistent with the Transition Agreement, which reposed responsibility for reparations on account of such claims upon Germany.

In a case referred to as *Krakauer I* plaintiffs in that case filed an action in the regional court in Bonn seeking compensation from the German government for forced labor performed for German industry during World War II. The regional court sought to certify to the Federal Constitutional Court the question: "What is the scope of the principle of international law which states that it is only possible to assert the material consequences of war on the basis of an international agreement?" In a May 13, 1996, opinion the Constitutional Court held that the matter was "procedurally impermissible" but made several observations by way of dicta: (i) With

respect to international law as it had evolved by the end of World War II, "in the case of international torts resulting from acts against foreign citizens, it is not the affected party himself who is entitled to a claim, but rather his homeland." (ii) However, international law would not prohibit a state from enacting domestic law affording individuals a right to compensation for war related injuries such as had been established in Germany pursuant to post-war treaties—"the state which violates international law is at liberty to grant claims based on its own national law." The Federal Constitutional Court remanded to the lower court to determine whether plaintiffs had legal claims under German law.

Thereafter, regional courts in Bonn (*Krakauer* II, November 5, 1997) and Bremen (June 2, 1998) ruled that valid claims sounding in tort and for disgorgement for unjust enrichment may be asserted by slave and forced laborers under ordinary German law. The Bonn court held that the 1953 Polish–East German Treaty waiving further reparation payments from East Germany did not affect individual claims of Polish forced laborers. The Bremen Court held that the claims of forced laborers were not affected by the waivers contained in the 1947 bilateral peace treaties.

The Bonn Regional Court in *Krakauer II* addressed claims of twenty-two plaintiffs against the German government seeking compensation for forced labor in German industry. The Regional Court dismissed twenty-one of the twenty-two plaintiffs on the ground they had already recovered under the German statutory scheme. It held that the remaining plaintiff, who had recovered only funds distributed by the Jewish Claims Conference, stated a valid tort claim against the German government. The Regional Court ruled that the plaintiff's claims were recognized and deferred by the London Debt Agreement and that, upon the effective date of the 2 + 4 Treaty, the deferral had been removed and the claims were timely.

(This, of course, parallels plaintiffs' contention in the present case and is authority upon which plaintiffs rely heavily. The fact that the conclusion is rejected here does not, of course, prevent German courts from adopting it when applying German law).

In December 1998 the Regional Appeals Court in Cologne reversed the judgment of the Bonn Regional Court and ordered that the claims of the remaining plaintiff be dismissed, stating, "[b]ased on existing statutes, the victims of National Socialist persecution are not entitled to compensatory damage or compensation claims against the Federal Republic for the forced labor which they performed." *Krakauer* III. It found that the London Debt Agreement did not presuppose the existence of individual claims for compensation and that "certainly the intention was not to establish such a claim." Further, "[i]t is therefore not possible to infer from the 2 + 4 Treaty that the compensation claims of victims of National Socialism persecution were revived upon the conclusion of the Treaty." After reviewing the scope of German statutory and lump sum agreements the Cologne Regional Appeals Court observed that this compensation system "was intended to constitute a definitive settlement with respect to all persecution victims by means of statutory measures and conclusion of international law treaties."

The decision of the Regional Appeals Court "applies only to the extent that claims are asserted against the German Reich, the Federal Republic of Germany and the German (federal) states. It is intended that additional claims against entities and persons named in par. 2 [private parties] remain intact."

Appeals are presently pending from the decision of the Bremen Regional Court and from the Cologne Regional Appeals Court. It is evident that there are numerous unresolved issues of German law relating to claims of war time forced laborers both as against the German government

and as against private German corporations. Some of these issues arose in the context of the *Krakauer* cases; others are discussed in Dr. Wolf's declaration.

Whatever the final resolution of these issues may be, there is nothing in the German litigation process or potential outcomes that is inconsistent with the conclusion that individual claims for forced labor against the German government and against private industry were subsumed by national governments in the treaties which concluded the war with Germany. Through the Transition Agreement the subsuming governments delegated to Germany the responsibility to provide for all these claims "adequate" compensation consistent with "[t]he capacity to pay of the Federal Republic." The German litigation is enmeshed in Germany's efforts to meet its obligations under the Transition Agreement.

**E. *Conclusion:*** Plaintiffs have characterized their claims as typical claims of individuals against private entities, analogizing them to a claim for an assault or battery or a claim for an invasion of a property right. In Dr. Wolf's example: "An alien bought a car and the seller is not willing to fulfill his contractual obligation ... if the court dismisses the action because of the foreign nationality of the private person this constitutes a breach of international law." Wolf Declaration at 31. Dr. Wolf also distinguishes claims against the state from claims against private entities on the basis of the consequences of an overwhelmingly large adverse judgment or award. The financial consequences of such a judgment or award against the state cannot be avoided and the entire economy suffers. The financial consequences of such an award against a private company, on the other hand, can be resolved by liquidation of the company with no resulting adverse consequences to the economy as a whole.

It is not accurate to characterize the present actions as simply controversies between private parties. The actions against Degussa and Siemens are but four of the many slave labor cases being brought in courts of the United States against a host of major German corporate entities. Plaintiffs furnished a list of the cases, and the defendants include: [3]

Adam Apel AG

Albert Ackerman G m b H & Co KG

Alcatel Sel AG

Audi AG

BASF AG

Bayer AG

Bayeriche Motoren Werke AG

Beiersdorf AG

Robert Bosch G m b H

Hugo Boss AG

Continental AG

Daimler–Benz AG

Daimler–Chrysler AG

Deutsche Lufthansa AG

Diehl G m b H & Co.

Dunlopp AG

Durkopp Adler AG

Dycherhoff AG

Ford Werke AG

Franz Haniel & Cie AG

Fried Krupp AG AG Hoesch–Krupp

Heidelberger Zeurent AG

Henkel KGAA

Hoechst AG

Leica Camera AG

Leonard–Moll AG

Magna International, Inc.

Man AG

Mannesman AG

Optische Werke G. Rodenstock

Phillip Holzman AG

Rheinmetal Group

Schering AG

**3.** Excluded from the defendants listed here are German banks and insurance companies. The claims against them are apparently not based on slave labor and may not be governed by the same legal principles which control the instant case.

Steir–Daimler–Puck AG

Stiftung & Co.

Thyssen AG

Varta AG

VIAG

Voest AG

Volkswagon AG

Wurttembergissche Metallwarenfabrick AG

These corporations, in the aggregate, must have employed a substantial portion of the industrial slave laborers brought into Germany during the war. Presumably plaintiffs in all of these cases seek similar relief—an accounting, a constructive trust, the value of the forced labor, disgorgement of illicit profits, compensatory damages with interest compounded annually from May 8, 1945, punitive damages and attorneys fees. Viewed in their entirety these cases are hardly the typical individual against individual cases posited by plaintiffs and Dr. Wolf.

At the hearing on defendants' motions plaintiffs suggested that the relief they seek is much more limited, confined to disgorgement of unjust profits earned by defendants from plaintiffs' uncompensated labor. In a post-hearing submission plaintiffs suggested that this court is vested "with substantial discretion in determining the ground rules governing damages and procedures." In effect, plaintiffs are inviting this court to try its hand at refashioning the reparations agreements which the United States and other World War II combatants (whose blood and treasure brought the war of conquest and the program of extermination to an end) forged in the crucible of a devastated post-war Europe and in the crucible of the Cold War. As discussed below, this is a task which the court does not have the judicial power to perform.

 To state the ultimate conclusion, the questions whether the reparation agreements made adequate provision for the victims of Nazi oppression and whether Germany has adequately implemented the reparation agreements are political questions which a court must decline to determine. Accepting that the court has jurisdiction over the subject matter of this case and assuming that it has jurisdiction over the parties it must nevertheless refrain from adjudicating this dispute.

Engrafted on the Constitution by the Supreme Court, the political question doctrine has a long history recounted in detail in Judge Adams' majority opinion for a Three–Judge District Court, *Atlee v. Laird,* 347 F.Supp. 689 (E.D.Pa.1972), *aff'd,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) Justice Brennan noted that the political question doctrine rests not upon concepts of federalism but rather upon the structure of the national government—the separation of powers. The Court provided a six-pronged test for determining whether an issue constitutes a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. 691.

To a greater or lesser extent all of the above indicia are present in the instant case. First and foremost, "[t]he Constitution commits to the President all of the foreign policy powers of this country with

the exception that the Senate must approve treaties." *Atlee,* 347 F.Supp. at 702.

In several respects, then, issues dealing with the foreign affairs of this country are distinguishable for the purpose of applying the political question doctrine, from those primarily concerning internal operations. First, the potentially relevant information in a foreign policy case comes from a multitude of sources—both domestic and foreign—and might, by sheer bulk alone, be unmanageable for a court. In addition, there is the very real possibility that the parties might not assemble all the data, in which case any attempt by the court to justify a decision on the merits of an issue having so profound an effect on the nation would be both difficult and unwise. Such a related problem concerns confidentiality. In certain instances, it would surely be conceded, the information necessary to a reasoned judgment should remain confidential. If, because of confidential information, not all the facts could be evaluated, any adjudication of a case whose decision might adversely affect this country's international posture would be imprudent.

*Id.* at 702; *see also, Chicago & Southern Air Lines v. Waterman S S Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). In *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the Court emphasized that in the field of foreign relations, even without specific constitutional authorization, the political branches have broad powers not subject to examination by the judiciary.

Issues similar to those confronted in the present case arose in *Belk v. United States,* 858 F.2d 706 (Fed.Cir.1988). In the 1981 Algiers Accords, pursuant to which the Americans held hostage in Iran were released, the United States agreed to a provision prohibiting United States nationals from prosecuting claims related to the seizure of the hostages, their detention and injuries to them or their properties that occurred before the date of the Accords. The United States Claims Court granted summary judgment dismissing a complaint of former hostages seeking compensation for the alleged taking of their property right—the right to sue Iran for injuries. The Court of Appeals for the Federal Circuit affirmed on the alternative grounds that (i) the government's action did not constitute a taking and (ii) the complaint would require the resolution of political questions. With respect to the second ground the Court recited the *Baker v. Carr* political question criteria and stated:

Most, if not all, of those concerns are present in this case. It involves a policy decision made by the President during a time of crisis. The appellants apparently contend that the President should not have entered into the Algiers Accords because he could have obtained better terms, and that the Accords themselves were illegal because the President was coerced into agreeing to them. The determination whether and upon what terms to settle the dispute with Iran over its holding of the hostages and obtain their release, necessarily was for the President to make in his foreign relations role. That determination was "of a kind clearly for nonjudicial discretion," and there are no "judicially discoverable and manageable standards" for reviewing such a Presidential decision. A judicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations. *Cf. Curtiss–Wright,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; *Shanghai Power,* 4 Cl.Ct. 237.

C. Although the appellants underwent an agonizing experience, they have not stated a valid claim for a taking by the United States of their causes of action against Iran that, as they frame their case, is appropriate for judicial resolution. If there is to be any compensation of the appellants for the mistreatment and suffering they underwent

during their captivity as hostages in Iran, it must be provided by one of the other "coordinate branches of government."

*Id.* 82 S.Ct. at 710.

The present case illustrates in a most graphic way the wisdom of the above observations. Reparations were but one facet of an extraordinarily critical series of negotiations concerning the future of a war-devastated Europe and later the defense not only of Europe but of the entire western world against the threat of conquest and tyranny which the Soviet Union presented. Voluminous as they are, the documents and information which the parties have presented in this case are but an infinitesimal portion of the information relevant to the life and death concerns with which the United States and the other nations were wrestling as they shaped the various treaties described in this opinion. Suggestive of the forbidden nature of the territory where plaintiffs ask this court to tread is the fact that even at this early stage of the litigation the Federal Republic of Germany and the Minister of Foreign Affairs of the Republic of Poland have intervened as amici curiae to urge their respective views.

Were the court to undertake to fashion appropriate reparations for the plaintiffs in the present case, it would lack any standards to apply. Concededly the resources are lacking to provide full indemnification for the terrible wrongs which plaintiffs, the plaintiffs in related cases and those they seek to represent suffered at the hands of Nazi Germany and at the hands of the giants of German industry which played an integral part in the perpetration of those wrongs. Wrongs were suffered not only by the classes of persons represented in these proceedings, however, but also by many other classes of persons in many lands. They, too, had claims against German assets. By what conceivable standard could a single court arrive at a fair allocation of resources among all the deserving groups? By what practical means could a

single court acquire the information needed to fashion such a standard? This was a task which the nations involved sought to perform as they negotiated the Potsdam Agreement, the Paris Agreement, the Transition Agreement and the 2+4 Treaty. It would be presumptuous for this court to attempt to do a better job.

If plaintiffs sought only enforcement of the Transition Agreement the situation would be no different. The Transition Agreement imposes upon Germany the obligation to provide "adequate compensation", taking into consideration "[t]he capacity to pay of the Federal Republic." Plaintiffs have pointed out gaps in the compensation programs which Germany has established by legislation and treaty and in effect are arguing that they do not provide adequate compensation to them and those they represent. Determining adequacy in relation to the capacity of the Federal Republic to pay confronts the same lack of standards as establishment of a reparation program in the first instance. Whether the Transition Agreement has been complied with is for determination by the parties to the Agreement, not a court. In fact, as recited above, the United States and other nations are in continuing negotiation concerning implementation of Germany's obligations under that Agreement. A court may not intervene. *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918).

The other *Baker v. Carr* factors are pertinent in this case. Major policy determinations are implicated in the determination of the size and in the allocation of reparations. They are not the subject of judicial discretion. For a court now, in the light of the diplomatic history of the last fifty-five years, to structure a reparations scheme would be to express the ultimate lack of respect for the executive branch which conducted negotiations on behalf of the United States and for the Senate which ratified the various treaties which emanated from these negotiations. These are decisions which were made in the face

of serious foreign policy concerns. An attempt by a court to undo them would create the "embarrassment for multifarious pronouncements by various departments on one question." *Baker,* 369 U.S. at 217, 82 S.Ct. 691. One need only consider the damage which would be created if foreign nations negotiating with the United States were confronted with a situation in which a solemn pact reached with the Executive Department and ratified by the Senate could be undone by a court.

Every human instinct yearns to remediate in some way the immeasurable wrongs inflicted upon so many millions of people by Nazi Germany so many years ago, wrongs in which corporate Germany unquestionably participated. For the reasons set forth above, however, this court does not have the power to engage in such remediation.

Whether the present motions are viewed as motions to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) or as motions for summary judgment for defendants under Fed.R.Civ.P. 56, the cases are ripe for disposition on justiciability grounds. The texts of the applicable treaties are part of the record. The plaintiffs' accounts of the wrongs they suffered at the hands of the Nazi government and the defendants are deemed to be completely accurate. The historical events recited herein are established either by undisputed submissions in the record or are of common knowledge. On the basis of this record the case must be dismissed. Appropriate orders will be entered.